Walter BRIEHL, Appellant,

v.

John Foster DULLES, Secretary of State, Appellee.

No. 13317.

United States Court of Appeals
District of Columbia Circuit.

Argued Jan. 29, 1957.

Decided June 27, 1957.

Edgerton, Bazelon, and Fahy, Circuit Judges, dissented.

Mr. Leonard B. Boudin, New York City, with whom David Rein, and Joseph Forer, Washington, D. C., were on the brief, for appellant.

Mr. B. Jenkins Middleton, Attorney, Department of Justice, with whom Asst. Atty. Gen. Doub, Mr. Oliver Gasch, U. S. Atty., and Mr. Paul A. Sweeney, Attorney, Department of Justice, were on the brief, for appellee. Mr. Lewis Carroll, Asst. U. S. Atty., also entered an appearance for appellee.

Before EDGERTON, Chief Judge, and PRETTYMAN, WILBUR K. MILLER, BAZELON, FAHY, WASHINGTON, DANAHER and BASTIAN, Circuit Judges, sitting en banc.

EDGERTON, Chief Judge, announced the judgment and division of the court as follows:

The judgment of the District Court, granting the Secretary's motion for summary judgment, is affirmed. Judges Prettyman, Miller, Washington, Danaher and Bastian vote to affirm. Judges Ed-

gerton and Bazelon vote to reverse. Judge Fahy votes to remand to the District Court with instructions to remand to the Secretary. Judge Burger took no part in the consideration or decision of this case.

Judge Prettyman files an opinion in which Judges Miller, Danaher and Bastian concur. Judge Washington files an opinion concurring in the result reached by Judges Prettyman, Miller, Danaher and Bastian. 101 U.S.App.D.C. ——, 248 F.2d 576. Judge Bazelon files a dissenting opinion in which Judge Edgerton concurs. 101 U.S.App.D.C. ——, 248 F.2d 579. Judge Edgerton also files a separate dissent. 101 U.S.App.D.C. ——, 248 F.2d 596. Judge Fahy files a dissenting opinion. 101 U.S.App.D.C. ——, 248 F.2d 597.

PRETTYMAN, Circuit Judge, with whom WILBUR K. MILLER, DANAHER and BASTIAN, Circuit Judges, concur: Appellant, Dr. Walter Briehl, applied in April, 1955, to the Department of State for renewal of a passport, stating his desire to attend an international psychoanalytic congress in Geneva and a World Mental Health Organization Congress in Istanbul. He was and is engaged in the practice of medicine, specializing in psychiatry. In prior years he had attended international meetings in this field. The Director of the Passport Office wrote him that "it would be helpful to the Department if you would furnish an affidavit setting forth whether you are now or ever have been a Communist, and explain your connections with" certain named organizations. Dr. Briehl's attorney replied, saying in part:

"My clients refuse to submit the affidavits your letters request. Your demands and the vague and formless standards of the passport regulations under which you purport to act are palpable violations of their Constitutional rights, including, but not limited to, the First, Fifth, Ninth and Tenth Amendments."

The attorney described Dr. and Mrs. Briehl's professional interests and concluded by saying: "Demand is hereby made that passports as applied for by them be issued forthwith."

Thereupon the Director of the Passport Office wrote Dr. Briehl, saying in part:

"I regret to inform you that after careful consideration of your application for the renewal of passport facilities, the Department of State is obliged to disapprove your request tentatively on the ground that the granting of such further passport facilities is precluded under the provisions of Section 51.135 of Title 22 of the Code of Federal Regulations. A copy of the pertinent Regulations is enclosed for your information.

"In cases coming within the purview of the Regulations above referred to, it is the practice of the Department to inform the applicant of the reasons for the disapproval of his request for passport facilities insofar as the security regulations will permit. In your case it has been alleged that you were a Communist."

Dr. Briehl's attorney replied in part:

"[My clients] wish you to be advised that they do not choose to offer any evidence in support of their applications for passports unless and until they are confronted with the informers your letter states have furnished you with proof that they have been, are, or intend to engage in acts contrary to the national interests of this country."

Thereafter the attorney wrote several times demanding the issuance of the passports and "an evidentiary hearing". An "informal" hearing was arranged. Dr. Briehl, his attorney, and two representatives of the State Department attended. The attorney made an extended statement, in the course of which he recounted the correspondence, described

Dr. Briehl's purposes in seeking to go abroad, and made three points as follows:

"Our first point, therefore is that medicine has nothing to do with politics and you may not introduce and confuse the issue of his right to practice medicine and his right to study, and his right to participate in conferences by injecting this issue of politics in connection with his travel abroad. When a physician has a legitimate purpose in going abroad as was stated here, all issues of political affiliations, past or present, definite or indefinite, good or bad, are irrelevant. That will be our first point. * * * My second point is that everyone has the right to travel regardless of political considerations. * * * Now we turn to the third point. * * * that you confront us with the evidence against Dr. Briehl. * * * It is up to the Department to support those allegations by evidence and witnesses which we can examine and confront. * * * [W]e have a right to what the courts have now called a quasijudicial hearing, * * * and * * * it is the Department's job to prove not only the facts with respect to each of these allegations but it is the Department's job to prove wherein each of these activities was wrong and wherein the activities were in violation of the laws of the United States."

The attorney later said:

" * * * Dr. Briehl will not execute an affidavit of the kind you requested. He will not execute an affidavit with respect to past membership; he will not execute an affidavit with respect to present membership; he will not execute an affidavit with respect to future membership. And that does not apply only to the Communist Party situation, it applies to any political activities or associations or beliefs because those are things which

we think are irrelevant to the right of travel and particularly irrelevant, in fact, incredibly so, to the right of a physician to travel for the purposes indicated in the application for the passport renewal."

In response to a letter from Dr. Briehl's attorney, counsel for the Board of Passport Appeals replied:

"It is understood that you appeared with your client, Dr. Briehl, at a hearing in the Passport Office on August 30, 1955. It is further understood that Dr. Briehl refused to execute an affidavit as to present or past membership in the Communist Party, having been requested to do so by the Passport Office. The Board has not been advised of any further processing of this case under Section 51.137 of the Passport Regulations.

"In these circumstances, the Board could not entertain an appeal from Dr. Briehl at this time. Your attention is invited to Sections 51.-138 and 51.142 (22 CFR) of the Passport Regulations, and Sections 51.156(2) and 51.147 (22 CFR) of the Rules of the Board."

And a few days later the Passport Office wrote:

"You will recall that during the recent informal hearing in which you represented Dr. Briehl, he refused to explain or deny the allegations concerning him. He also refused to submit an affidavit setting forth whether he was or ever had been a member of the Communist Party.

"In view of the above, the Department knows of no further action which it can appropriately take in the case of Dr. Briehl."

Dr. Briehl filed a civil action in the District Court, naming the Secretary of State as defendant. He prayed for a judgment decreeing that he is entitled to a passport under the statutes, that the passport regulations of the Secretary of State are invalid and illegal, and

that the refusal to renew the passport was in violation of his (Briehl's) rights under the Passport Act of 1926, the Constitution of the United States and the Declaration of Human Rights of the United Nations; enjoining the Secretary from continuing to deny the passport; and directing him to renew the passport.

The Secretary answered, and a motion and a cross motion for summary judgment were made, with supporting affidavits and exhibits. The court rendered a brief opinion, denied the plaintiff's motion, and granted the motion of the Secretary.

In this court Dr. Briehl divides his argument into four main points:

1. Appellant's constitutional right to travel could not be conditioned upon his execution of a non-Communist affidavit or compliance with any other political test.

2. Appellee's regulations deprive appellant of procedural due process and the quasi-judicial hearing to which he is entitled under the recent decisions of this Court.

3. The regulations are not authorized by statute, they conflict with the will of Congress and were invalidly promulgated.

4. The Secretary has not made out a case against appellant, even under the Regulations.

The arguments thus advanced involve consideration of six basic subjects.

**I**

*The nature of the Communist movement.* Dr. Briehl's underlying premise, as shown by the statements we have quoted, is that Communist membership or affiliation is a matter of politics, an issue of political affiliation, a political consideration, a political test, and thus is subject to the same rules which apply to political beliefs generally. But it is not so. The Communist organization and program have long since passed beyond the area of mere politics and political opinion. All three branches of the Federal Government—the executive, the legislature, and the judiciary—have declared unequivocally that the Communist movement today is an international conspiracy aimed at world domination and a threat to the internal security of this country. The foreign policy and a large part of the fiscal policy of the Government are based upon that proposition.

The Congress declared in 1950:

"There exists a world Communist movement which, in its origins, its development, and its present practice, is a world-wide revolutionary movement whose purpose it is, by treachery, deceit, infiltration into other groups (governmental and otherwise), espionage, sabotage, terrorism, and any other means deemed necessary, to establish a Communist totalitarian dictatorship in the countries throughout the world through the medium of a world-wide Communist organization."[1]

President Truman declared in 1950:[2]

"WHEREAS world conquest by communist imperialism is the goal of the forces of aggression that have been loosed upon the world; and

"WHEREAS, if the goal of communist imperialism were to be achieved the people of this country would no longer enjoy the full and rich life they have with God's help built for themselves and their children; they would no longer enjoy the blessings of the freedom of worshipping as they severally choose, the freedom of reading and listening to what they choose, the right of free speech including the right to criticize their Government, the right to choose those who conduct their Government, the right to engage freely in collective bargaining, the right to engage freely in their own business enterprises, and the many

---

1. 64 Stat. 987, 50 U.S.C.A. § 781(1).

2. Proc. No. 2914, 64 Stat. A454, 50 U.S. C.A.Appendix note preceding section 1.

other freedoms and rights which are a part of our way of life; * * *."

In his Inaugural Address of January, 1957, President Eisenhower said:

"The divisive force is international communism and the power that it controls.

"The designs of that power, dark in purpose, are clear in practice. It strives to seal forever the fate of those it has enslaved. It strives to break the ties that unite the free. And it strives to capture—to exploit for its own greater power—all forces of change in the world, especially the needs of the hungry and the hopes of the oppressed."[3]

In his State of the Union speech on January 10, 1957, the President had said: "The existence of a strongly armed imperialistic dictatorship poses a continuing threat to the free world's and thus to our own Nation's security and peace."[4] He referred to "Communist persecution" and to "Soviet aggression".[5]

The Supreme Court has held valid and sufficient the findings of Congress[6] and the findings of a jury[7] to the same import as the foregoing declarations. In Galvan v. Press the Court quoted the above-quoted congressional finding and said: "Certainly, we cannot say that this classification by Congress is so baseless as to be violative of due process and therefore beyond the power of Congress."[8] In American Communications Ass'n v. Douds[9] the Court, balancing the interest of the public against a partial abridgement of speech, upheld the statutory requirement that a person must swear he is not a member of the Communist Party before he can avail himself or his organization of the processes of the Labor Board.[10]

There exists in some quarters a dogged insistence that the Communist movement be treated as any other political organization. It is as though one argued that, since opiates and aspirin both possess medicinal properties, they must be subjected to the same permissions and restrictions. The fact is that opiates are to be and are regulated because of their own peculiar characteristics. And so is the Communist movement and its affiliates. It would be inexcusably naive for any court to declare in the present state of the world that adherence to the Communist cause is a mere matter of politics or political opinion. We shall treat the Communist movement according to what the Congress, the President, and the Supreme Court have declared it to be.

## II

*The power of government in foreign affairs.* Whatever may be the dispute—and it has been extended and intense—as to the division of this power as between the President and the Congress, it seems settled beyond dispute that those two branches between them possess the totality of the power. In a long line of cases, beginning perhaps with Foster v. Neilson[11] and extending down to United States v. Curtiss-Wright Corp.,[12] United States v. Belmont,[13] Chicago &.

---

3. 103 Cong.Rec. 729 (daily ed. Jan. 21, 1957).

4. 103 Cong.Rec. 389 (daily ed. Jan. 10, 1957).

5. Id. at 390.

6. Galvan v. Press, 347 U.S. 522, 74 S.Ct. 737, 98 L.Ed. 911 (1954).

7. Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951).

8. Supra note 6, 347 U.S. at page 529, 74 S. Ct. 737.

9. 339 U.S. 382, 70 S.Ct. 674, 94 L.Ed. 925 (1950).

10. And see the opinion of Mr. Justice Jackson in American Communications Ass'n v. Douds, id., 339 U.S. at page 424 et seq., 70 S.Ct. 674, with its accumulation of underlying data.

11. 2 Pet. 253, 27 U.S. 253, 7 L.Ed. 415 (1829).

12. 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936).

13. 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134 (1937). Belmont is discussed at length and with approval in United States v. Pink, 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796 (1942).

Southern Air Lines v. Waterman Corp,[14] and Ludecke v. Watkins,[15] the Supreme Court has laid down the rule that foreign affairs and decisions upon foreign policy are political matters entrusted by the Constitution to the political departments of the Government, and that the judiciary has no part in them. Mr. Justice Jackson, writing for the Court in the Chicago & Southern Air Lines case, stated the proposition in succinct, quotable terms. He wrote:

"The President, both as Commander-in-Chief and as the Nation's organ for foreign affairs, has available intelligence services whose reports are not and ought not to be published to the world. It would be intolerable that courts, without the relevant information, should review and perhaps nullify actions of the Executive taken on information properly held secret. Nor can courts sit *in camera* in order to be taken into executive confidences. But even if courts could require full disclosure, the very nature of executive decisions as to foreign policy is political, not judicial. Such decisions are wholly confided by our Constitution to the political departments of the government, Executive and Legislative. They are delicate, complex, and involve large elements of prophecy. They are and should be undertaken only by those directly responsible to the people whose welfare they advance or imperil. They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and which has long been held to belong in the domain of political power not sub-ject to judicial intrusion or inquiry."[16]

The range of permissible judicial action in the case at bar is narrowed also by the fact that the Secretary is acting in the context of a national emergency. Only the President may declare an emergency; he has done so.[17] The existence of an emergency indisputably enhances both executive and legislative power.[18] The Secretary has acted pursuant to two acts of Congress,[19] which not only recognize the administrative function of the executive in this area but also delegate to the executive any rule-making power it may have lacked. Thus the Secretary's acts are buttressed by the sovereign power to defend the nation.

There are of course in any government formed upon a constitution residual areas within which the judicial branch may act in respect to a power even so unfettered as is the executive power in foreign affairs. If the President were in gross defiance of constitutional limitations, or perhaps even of congressional prohibitions, the judiciary might act. The Supreme Court has also held [20] that, where the Secretary refused to issue a passport solely upon an erroneous finding of mixed law and fact (in that case citizenship), a decree precluding his denial on that ground could issue.

It must be kept in mind that the power of the judiciary to inquire is vastly different from its power to act. A court often has jurisdiction to determine whether it has jurisdiction. The books are full of cases in which the courts have examined with meticulous care complaints alleging invalidity of executive action in foreign affairs. But seldom

14. 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568 (1948).

15. 335 U.S. 160, 68 S.Ct. 1429, 92 L.Ed. 1881 (1948).

16. Supra, 333 U.S. at page 111, 68 S.Ct. 431. Extensive discussions of the doctrines underlying the powers of the President are in the opinions in Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952).

17. Proc. No. 2914, supra note 2.

18. Hirabayashi v. United States, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943).

19. 44 Stat. 887 (1926), 22 U.S.C.A. § 211a; 66 Stat. 190 (1952), 8 U.S.C.A. § 1185.

20. Perkins v. Elg, 307 U.S. 325, 349, 59 S.Ct. 884, 83 L.Ed. 1320 (1939).

if ever have the courts found grounds to impose upon such executive action their own ideas of propriety or wisdom. So in the case at bar it is not suggested that the court could not entertain a complaint against the Secretary of State alleging the illegality of his action. The point is that having examined the allegations the court is without power to act save in a narrow and limited class of extraordinary circumstances.

The inquiry in the case before us is whether the Secretary has so far violated constitutional prescriptions or specific congressional limitations as to cast his action outside the exceedingly broad boundaries within which he is free to act without judicial review.[21]

## III

*The nature of a passport.* In Urtetiqui v. D'Arbel[22] the Supreme Court said in 1835:

> "It is a document, which, from its nature and object, is addressed to foreign powers; purporting only to be a request, that the bearer of it may pass safely and freely; and is to be considered rather in the character of a political document, by which the bearer is recognized, in foreign countries, as an American citizen; and which, by usage and the law of nations, is received as evidence of the fact."[23]

But, whatever may have been its nature in the past, the pertinent characteristic of a passport in the present controversy is that it is a requisite for going abroad. And thus it has become a tool with which the Department of State can prevent the presence of any American citizen in a foreign country.

A statute,[24] alluded to by the Supreme Court in Johnson v. Eisentrager,[25] provides that, whenever the President learns that a citizen of the United States has been deprived of his liberty by any foreign government, he must demand the reasons and, if it appears the imprisonment is wrongful, demand release and use such means not amounting to war as are necessary to effectuate the release. So, while a passport as such does not bestow rights of protection which a citizen does not otherwise have, it does, as a permit to travel abroad, allow him to put himself in a position where he may invoke the protective power of this government. So one of the questions here is whether the Secretary may prevent an American with Communist affiliations from being in a place where political indiscretion might involve the United States Government in international complications.

## IV

*The right to travel.* The present dispute over passport denials is less than a decade old, but its antecedents are to be found deep in the history of Anglo-American law. The English sovereign had for many centuries a recognized right to prevent foreign travel and to recall subjects from abroad.[26] Late in the Eleventh Century Anselm, Archbishop of Canterbury, was forbidden by William Rufus, son of William the Conqueror, to go to Rome to receive the pallium from Pope Urban II.[27] The Magna Carta, as signed by John Lackland at Runnymede in 1215, deprived the King of the right to prevent foreign travel. However John died shortly afterward, and William Marshall, regent of Henry III, republished the Charter without the guaran-

21. See Carrington, Political Questions: The Judicial Check on the Executive, 42 Va.L.Rev. 175 (1956).

22. 9 Pet. 692, 34 U.S. 692, 699, 9 L.Ed. 276.

23. See 3 Hackworth, Digest of International Law § 259 (1942).

24. 15 Stat. 224 (1868), 8 U.S.C. § 903b [now 22 U.S.C.A. § 1732].

25. 339 U.S. 763, 770, 70 S.Ct. 936, 94 L. Ed. 1255 (1950).

26. 1 Bl.Comm. * 265; 3 Co.Inst. * 178; 1 Holdsworth, History of English Law 230 (6th ed. 1938); Taswell-Langmead, English Constitutional Law 128–130 (4th ed. 1890).

27. 2 Encyclopaedia Britannica, Anselm (1945); Beames, Ne Exeat Regno 1–2 (2d ed. 1824).

tees of freedom of travel.[28] In the following centuries the kings frequently exercised their prerogative, usually through the issuance of a writ *Ne Exeat Regnum*.[29] Parliament also exercised the prerogative by passing statutes which forbade foreign travel to certain classes [30] or which recognized the right of the King to limit travel.[31] However the writ has gradually fallen into disuse. It is most unlikely that a writ *Ne Exeat Regnum* would issue in modern England, except in time of war.[32] This does not mean that an Englishman has an enforceable right to a passport.[33]

The Articles of Confederation [34] and the Constitution of the United States [35] clearly recognized the right of citizens to travel among the various states. But whether the liberty mentioned in the Fifth Amendment included liberty to leave this country and circulate among foreign nations was not so clear. A three-judge federal District Court recognized in 1952 that a citizen has at least a limited right to international travel.[36] This court has since recognized that right.[37] However the existence of this limited right does not preclude the existence in the sovereign of a right to limit travel. The Supreme Court has established the power of the Government to recall a person from abroad to appear in a lawsuit, an exercise of the same sort of control over movement available to the English sovereign through *Ne Exeat Regnum*. In Blackmer v. United States [38] the Court made the broad statement:

"What in England was the prerogative of the sovereign in this respect, pertains under our constitutional system to the national authority which may be exercised by the Congress by virtue of the legislative power to prescribe the duties of the citizens of the United States."

While Blackmer refers to the power to limit foreign travel as being exercised by the Congress, the power is not solely congressional. In matters pertaining to war and emergency or to the foreign policy, the power may reside in the executive or in both branches jointly. Whatever the theoretical residence of such power, the power to limit travel has in fact been exercised through the cooperative efforts of Congress and the President. During the War of 1812 Congress forbade citizens to travel into enemy countries without passports.[39] During the Civil War passports were required of all persons entering or leaving the country.[40] In 1861 Secretary of State Seward ordered that "Until further notice, no person will be allowed to go abroad from a port of the United States without a passport either from this Department or countersigned by the Secretary of State". This action was taken by the executive branch on its own initiative, without the sanction of Congress.

In 1856 Congress had granted the Secretary of State sole authority to issue passports.[41] The Secretary was authorized to issue them "under such rules as the President shall designate and pre-

---

28. See Note, Passports and Freedom of Travel: The Conflict of a Right and a Privilege, 41 Geo.L.J. 63 (1952), for a detailed account of the history of the Magna Carta and the status of the common law in this regard.

29. 3 Co.Inst. * 179.

30. Id. at * 178–179.

31. 5 Richard II, c. 2, §§ 6, 7 (1381), 2 Stat. at L. 236 (Pick.1762).

32. See Note, 41 Geo.L.J., supra note 28, at 70; Diplock, Passports and Protection in International Law, 32 Grotius Soc. 42, 44 (1947).

33. Diplock, supra note 32, at 53.

34. Art. IV.

35. Art. IV, § 2. See Hess v. Pawloski, 274 U.S. 352, 47 S.Ct. 632, 71 L.Ed. 1091 (1927); Williams v. Fears, 179 U.S. 270, 21 S.Ct. 128, 45 L.Ed. 186 (1900).

36. Bauer v. Acheson, D.C.D.C., 106 F. Supp. 445.

37. Shachtman v. Dulles, 96 U.S.App.D.C. 287, 225 F.2d 938 (1955).

38. 284 U.S. 421, 437–438, 52 S.Ct. 252, 76 L.Ed. 375 (1932).

39. 3 Stat. 199 (1815).

40. Dep't of State, The American Passport—History and Digest 50 (G.P.O. 1898).

41. 11 Stat. 60.

scribe". In 1918 Congress, leaving intact the broad discretion inherent in the words just quoted, gave the President power to make it unlawful to leave the country in time of war without a passport.[42] The President exercised this power by an appropriate proclamation.[43] The period between the two World Wars saw Congress reaffirm in the executive the broad discretion declared in the 1856 act, the new language being "may grant".[44] This was in a 1926 act which remains today the underpinning of congressionally-granted executive power in the field. That period also witnessed the codification in 1938 of State Department passport regulations and their affirmation by executive order.[45]

The machinery which today enables the State Department to regulate travel through passport control began to take shape in June of 1941, when Congress[46] amended the act of 1918[47] to enable the President to make it a crime to leave the country without a passport, not only in time of war but also during the existence of the national emergency proclaimed by the President on May 27, 1941.[48] On November 14, 1941, President Roosevelt exercised the authority over entry and exit vested in him by the amendment.[49] President Truman declared the termination of that state of emergency on April 28, 1952.[50] But the termination of the World War II emergency did not affect the Korean emergency, declared by President Truman on December 16, 1950.[51] Consequently our nation has been in a continuing state of emergency since May of 1941.

By act of June 27, 1952,[52] Congress declared:

"SEC. 215. (a) When the United States is at war or during the existence of any national emergency proclaimed by the President, * * and the President shall find that the interests of the United States require that restrictions and prohibitions in addition to those provided otherwise than by this section be imposed upon the departure of persons from and their entry into the United States, and shall make public proclamation thereof, * * *

* * * * * *
"(b) * * * and while such proclamation is in force, it shall, except as otherwise provided by the President, and subject to such limitations and exceptions as the President may authorize and prescribe, be unlawful for any citizen of the United States to depart from or enter, or attempt to depart from or enter, the United States unless he bears a valid passport."

This statute applies to any national emergency. It would appear that the Korean emergency, existing when the statute became law, made the section above quoted immediately operative. Any doubt on this score was removed by President Truman's proclamation of January 17, 1953,[53] specifically invoking the 1952 act.

▮ Two conclusions emerge from this complex series of laws, proclamations and orders. First, it is forbidden to leave this country without a passport. This rule was specifically provided by the Congress in the 1952 act, by the Presi-

42. 40 Stat. 559, 22 U.S.C.A. §§ 223–226b.
43. 40 Stat. 1829 (1918).
44. 44 Stat. 887 (1926), 22 U.S.C.A. § 211a.
45. Exec.Order No. 7856, 3 Fed.Reg. 681, 22 C.F.R. §§ 51.1–51.77 (1949).
46. 55 Stat. 252, 22 U.S.C.A. § 223.
47. Supra note 42.
48. Proc. No. 2487, 55 Stat. 1647, 50 U.S. C.A.Appendix, note preceding section 1.
49. Proc. No. 2523, 55 Stat. 1696, U.S. Code Cong.Service 1941, p. 883.
50. Proc. No. 2974, 66 Stat. C31, 50 U.S. C.A.Appendix note preceding section 1.
51. Proc. No. 2914, supra note 2.
52. 66 Stat. 190, 8 U.S.C.A. § 1185.
53. Proc. No. 3004, 67 Stat. C31, U.S.Code Cong. and Adm.News 1953, p. 915.

dent in Proclamation No. 3004,[54] and by the Secretary in Section 53.1 of his Regulations.[55] Second, it is within the power of the Secretary of State to refuse to issue a passport. This power is lodged in him by the act of 1926,[56] as implemented in Section 124 of Executive Order No. 7856;[57] is both claimed by the Secretary in Sections 53.1–53.9 of the Regulations and exercised by him thereunder; and is reaffirmed by the President in Proclamation No. 3004. The restrictions of the 1952 act upon travel without a passport can be read intelligibly only in the light of the Secretary's long-recognized power to refuse a passport.

Shortly after the passage of the 1952 act the Secretary issued additional regulations to govern the issuance of passports.[58] This was done pursuant to Executive Order No. 7856, supra, which specifically provided that the Secretary may make rules additional to the rules contained therein, so long as they are not inconsistent therewith.

### V

■ *The regulations of the Department.* The regulations which the Secretary promulgated [59] provide in substance that, in order that persons who support the world Communist movement may not through the use of United States passports further the purposes of that movement, no passport shall be issued to persons who are members of the Communist Party or to certain others who are believed to engage in activities which will advance that movement; that a person whose application is tentatively denied under the foregoing will be notified in writing, including notice of the reasons as specifically as security considerations permit; that such person will be entitled to present his case informally to the Passport Division and to appear before a hearing officer with counsel; and that if the decision is adverse it shall be in writing with reasons and the applicant shall be entitled to appeal to the Board of Passport Appeals, where he will be accorded a hearing with counsel. The regulations provide:[60]

> *"Oath or affirmation by applicant as to membership in Communist Party.* At any stage of the proceedings in the Passport Division or before the Board, if it is deemed necessary, the applicant may be required, as a part of his application, to subscribe, under oath or affirmation, to a statement with respect to present or past membership in the Communist Party. If applicant states that he is a Communist, refusal of a passport in his case will be without further proceedings."

The substantive part of the regulations [61] provides that no passport shall

---

54. Ibid.

55. 22 C.F.R. § 53.1 (1949).

56. Supra note 44.

57. Supra note 45.

58. 17 Fed.Reg. 8013 (1952), 22 C.F.R. §§ 51.135–51.143 (Supp.1952).

59. Ibid.

60. 22 C.F.R. § 51.142 (Supp.1955).

61. Id. § 51.135, reading in full text as follows:
    *"Limitations on issuance of passports to persons supporting Communist movement.* In order to promote the national interest by assuring that persons who support the world Communist movement of which the Communist Party is an integral unit may not, through use of United States passports, further the purposes of that movement, no passport, except one limited for direct and immediate return to the United States, shall be issued to:
    "(a) Persons who are members of the Communist Party or who have recently terminated such membership under such circumstances as to warrant the conclusion—not otherwise rebutted by the evidence—that they continue to act in furtherance of the interests and under the discipline of the Communist Party;
    "(b) Persons, regardless of the formal state of their affiliation with the Communist Party, who engage in activities which support the Communist movement under such circumstances as to warrant the conclusion—not otherwise rebutted by the evidence—that they have engaged in such activities as a result

be issued to certain described classes of persons. Roughly paraphrased those classes are (1) members of the Communist Party, (2) persons who have recently terminated Party membership under certain circumstances, (3) persons who support the Communist movement under certain circumstances, and (4) persons as to whom there is reason to believe they are going abroad for the purpose knowingly of advancing the Communist movement. We do not know from the record presently before us whether the Secretary would finally refuse a passport to Dr. Briehl if the matter were to progress to final decision, and we do not know in what proscribed class the Secretary might find Dr. Briehl upon the evidence before him if that evidence caused a refusal of the passport. And so we intimate no opinion upon the merits of Dr. Briehl's application; we have no opinion upon that subject. But, since we must determine the validity of the procedural provisions of the regulations, we face the validity of the underlying substantive provisions. We think those regulations [62] are valid as regulations.

The regulations in no way attempt to implement an unlimited discretion in the Secretary. They provide for peremptory denial of a passport under only one circumstance, admitted present membership in the Communist Party (Sec. 51.142). Standards for denials upon other grounds are set up. That section of the regulations (51.135) obviously contemplates findings upon facts. It uses such terms as "under such circumstances as to warrant the conclusion", "not otherwise rebutted by the evidence", and "on the balance of all the evidence". Thus the regulations clearly require facts—revealed or unrevealed—and an evaluation

of information. They do not provide for an unfettered discretion. Such provisions are the normal content of statutes or regulations which establish criteria for administrative action. Moreover, as we read the regulations, they refer to knowing associations with Communism.[63]

As we have pointed out, the Communist movement is, in the view of this Government, an aggressive conspiracy potentially dangerous to this country. Travel abroad by members of or adherents to the Communist movement is obviously an easy method of communication between such persons or organizations in this country and the prime sources of Communist policy and program in the Soviet Union and its satellites. Once a person with a passport is out of this country, this Government has no control over where he goes. His travel is controlled entirely by whatever countries he thereafter wishes to leave and to enter. The Department of State has authority to refuse to facilitate that communication.

In the second place, unless all the major foreign and fiscal policies of this Government, under two administrations of opposing political parties, have been a gigantic fraud, it is the unequivocal duty of the Department of State to prevent international incidents which might arouse hostile activities on the part of the Soviet Union or its satellites. To that end the Secretary may refuse to permit an adherent of the Communist movement, clothed with American citizenship, from being present in places where he may readily create incidents or may assert statutory rights to activity on the part of this Government in his behalf. The Secretary may preclude potential matches from the international tinderbox.

---

of direction, domination, or control exercised over them by the Communist movement.

"(c) Persons, regardless of the formal state of their affiliation with the Communist Party, as to whom there is reason to believe, on the balance of all the evidence, that they are going abroad

to engage in activities which will advance the Communist movement for the purpose, knowingly and wilfully of advancing that movement."

62. Ibid.

63. Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952).

As is recognized throughout this opinion, consistently with the other opinions of this court in this field,[64] the restrictions imposed by these regulations and the underlying statutes upon the right to travel are impingements upon that phase of liberty and indirectly upon the exercise of First Amendment rights. And so the problem in the case is once more the familiar problem of balancing private right against public requirement.[65] Our conclusion is reached by such a balancing. In the international situation of the present, the reasonable requirements of national security and interest and the delicate characteristics of foreign relations outweigh the needs or desires of an individual to travel, when the Secretary finds the facts to be such as to preclude grant of a passport under the regulation.

■ We therefore conclude that persons properly found to come within Section 51.135 of the Regulations are not illegally denied any constitutional right if they are refused passports.

■ It is suggested to us that, since the Internal Security Act of 1950 [66] made certain provisions pertaining to passports to members of registered Communist organizations, it preempted the field and rendered null all other statutes and regulations relating to Communists and passports. Such a conclusion would have to be an inference; we find no specific provision to that effect. We think the inference is not supportable. The 1950 act made it unlawful for a member of a registered Communist organization to apply for a passport or to use one, and made it unlawful for any officer or employee of the United States to issue a passport to such a member. It prescribed penalties up to $10,000 fine and five years' imprisonment for violation.[67]

So the 1950 act relating to passports is a criminal statute. It applies to only a portion of the people to whom the Secretary's regulations apply, as is easily seen by reference to Section 51.135. Moreover the 1952 statute, making it a crime for any person to leave the country without a passport during an emergency, was passed after the 1950 act. The 1952 act continued in effect the system of travel control by passport denial employed since 1941. That fact compels the conclusion that the criminal sanctions of the 1950 act are in addition to, not to the exclusion of, that control. Passport regulations under the later act are not prohibited by the former. We think the 1950 act did not preempt the field in respect to passports and adherents to the Communist movement.

## VI

■■ *The requirement for an affidavit.* In the case at bar Dr. Briehl was advised in writing that it had been alleged he was a Communist. He was required to admit or deny that allegation under oath before the proceeding on his application went further. Dr. Briehl urges, as we have seen, that he is entitled to be confronted with witnesses and evidence sustaining the Secretary's suggestions of Communist affiliations. He says he is entitled to that revelation without first filing an affidavit in response to the suggestions. He says this is a requisite of due process. But our judicial process knows no such requirement. Our judicial process is that a party must plead before he is entitled to trial. There is nothing new or novel about that. Dr. Briehl says he is entitled to know his opponent's evidence before he pleads. Under the rules of civil procedure, if a defendant party does not plead, a default judgment is entered against him. We

64. E. g., Shachtman v. Dulles, supra note 37; Boudin v. Dulles, infra; Robeson v. Dulles, 98 U.S.App.D.C. 313, 235 F.2d 810 (1956), certiorari denied 352 U.S. 895, 77 S.Ct. 131, 1 L.Ed.2d 86 (1956); Dulles v. Nathan, 96 U.S.App.D.C. 190, 225 F.2d 29 (1955).

65. See American Communications Ass'n v. Douds, supra.

66. Sec. 6, 64 Stat. 993, 50 U.S.C.A. § 785.

67. Sec. 15, 64 Stat. 1002, 50 U.S.C.A. § 794.

know of no reason why Dr. Briehl should not be required to admit or deny the Secretary's allegations before he gets an evidentiary hearing.

It is said that if Dr. Briehl should admit being a member of the Communist Party his application would thereupon promptly be denied, and therefore, it is said, no administrative remedy is really afforded him. But precisely the same thing happens to any party to a lawsuit. If he admits his opponent's allegations of fact he gets no evidentiary hearing; he gets an oral argument and perhaps a summary judgment against him. We know of no rule or doctrine that, if a party to a controversy admits adversary allegations of fact, the proceeding is void if no evidentiary hearing is thereafter afforded him. It is elementary that a party must raise an issue of fact in order to get a hearing on the facts.

In National Council of American-Soviet Friendship v. Brownell,[68] we held, citing several cases, that a party to an administrative proceeding could not default and still continue to litigate.

■ Moreover Dr. Briehl is an applicant. There is nothing new or novel about requiring an applicant for a permit or a license to supply pertinent information under oath. Applicants for radio licenses and air route certificates must do so, and applicants for marriage licenses, voting privileges, and business permits must also. And, failing to supply the required data, the applicant cannot exercise his right. We know of no reason why an application for a passport should not be treated by the usual rules pertaining to applications. If Communist Party affiliations are pertinent to the Secretary's decision upon the possible consequences or complications of an applicant's presence in foreign countries or his roving about foreign areas in present world conditions, we see no reason why Communist affiliations should not be part of the data required by the application.

Dr. Briehl complains that the evidence in respect to the allegations asserted in the Secretary's advices to him may be in part confidential, and he argues that such possibility effectively nullifies the due process of the procedure. He seeks to bring the situation within the doctrine followed by the Ninth Circuit in Parker v. Lester,[69] that, if it be established in advance that a proffered administrative remedy will not afford due process, the remedy need not be pursued. It is true that a passport denial may be based upon confidential information. But due process of law is a term of variable content.[70] The necessity for secrecy in the conduct of foreign affairs has been asserted, seemingly without question, ever since President Washington refused to submit to the House of Representatives the documents relating to the Jay Treaty.[71] The Supreme Court said in the Curtiss-Wright case:[72]

"The marked difference between foreign affairs and domestic affairs in this respect is recognized by both houses of Congress in the very form of their requisitions for information from the executive departments. In the case of every department except the Department of State, the resolution *directs* the official to furnish the information. In the case of the State Department, dealing with foreign affairs, the President is *requested* to furnish the information 'if not incompatible with the public interest.' A statement that to furnish the information is not compatible with the public interest rarely, if ever, is questioned."

68. 1957, 100 U.S.App.D.C. 116, 243 F.2d 222.

69. 1955, 227 F.2d 708.

70. Moyer v. Peabody, 212 U.S. 78, 84, 29 S.Ct. 235, 53 L.Ed. 410 (1909); Federal Communications Comm. v. WJR, 337 U.S. 265, 275, 69 S.Ct. 1097, 93 L.Ed. 1353 (1949).

71. See United States v. Curtiss-Wright Corp., supra, 299 U.S. at page 320, 57 S.Ct. at page 221.

72. Id., 299 U.S. at page 321, 57 S.Ct. at page 221.

And recognition of the necessity for secrecy in foreign affairs, coupled with a strong admonition to the judiciary against any attempts on its part to peer into or to unveil such confidential material, is contained in the Court's opinion in the Chicago & Southern Air Lines case, from which we have quoted. That case concerned the right of an American company to do business abroad. That was a right of the applicant if he could meet the appropriate specifications. But the Supreme Court specifically and emphatically pointed out that the President could deny the application for secret and confidential reasons. We know of no reason why an individual's right to travel abroad is to be treated by different constitutional standards than is his right to do business abroad. And we know of no reason why treatment of alleged Communist affiliation is to be put upon a preferred basis as compared with ordinary commercial infirmities or adverse suggestions.

Further justification for secrecy in a case of this type is supplied by the fact that the nation is in a state of national emergency, caused by the infiltration program of the Communist movement. During such an emergency cabinet officers may be forced to act on the basis of information the publication of which is inconsistent with national security. When the Secretary of State avows that in the interest of national security he cannot spread certain information on an open record, and explains with as much particularity as possible the reasons why he cannot do so, courts must rely upon his integrity and accept his statement.

We held in Boudin v. Dulles [73] that, where a passport has been denied by the Secretary on the authority of a specific regulation, he (the Secretary) must make findings in writing responsive to the requirements of that regulation, and in such a case must state whether the findings are based on evidence openly produced or on secret information and,

if the latter, "should explain with such particularity as in his judgment the circumstances permit the nature of the reasons why such information may not be disclosed." We adhere to that ruling. We are of the view that due process in passport proceedings does not prevent the use of confidential information when foreign affairs or the national security is involved.

In summary on this point we are of opinion that, if a person falls within one of the classes described in the regulations, the Secretary may refuse him a passport; and it follows that, if it be alleged he is in one of those classes and he refuses to admit or deny the allegation, the passport may be refused.

From the foregoing basic considerations some conclusions are easily reached. We summarize. In the deliberate judgment of this Government the Communist movement is today a conspiracy for world domination sufficiently threatening to the security of this nation to justify the expenditure of billions of dollars every year to thwart its ambitions. Limitations and prohibitions upon leaving one's country and traveling abroad have been enforced in periods of stress since time immemorial. It would be idle, if not ridiculous, in view of the absorption of the whole world in the problem of the Communist program and of the extent of the attention and activity of our own Government in that respect, for any court to say the present is not a period of stress in international affairs. The present limitations upon travel effectuated by passport control are authorized by statute and by presidential proclamation. They are, as we said in Shachtman v. Dulles,[74] an impingement upon a natural right of a citizen to travel. But no right, even the right to life, is absolute, and so the inquiry must be whether the impingement is valid. Executive action in the field of foreign affairs has been clothed in secrecy since the foundation of the Republic, and the Supreme Court

73. 98 U.S.App.D.C. 305, 235 F.2d 532 (1956).

74. Supra note 37.

has invariably protected that secrecy and repeatedly warned the judiciary not to invade that realm of executive prerogative. The rule has been applied by the Court even where the matter involved was transportation over international routes. Requirements that one admit or deny an adversary's allegations of fact before the right to an evidentiary hearing arises are elementary in judicial process; *a fortiori* in quasi-judicial process. And requirements that an applicant for a permit submit prescribed pertinent data as a prerequisite to consideration of his application are usual and valid in administrative procedure.

■ Analyzed to its underlying elements the critical problem in the case before us is simply whether the Secretary of State may decline to issue a passport to a person who refuses to admit or deny that he is a member of the Communist Party. We think he may. Or to state the problem in different terms, it is whether membership in or adherence to the Communist Party is a valid subject of inquiry prerequisite to the issuance of a passport under world conditions. We think it is.

We are of opinion that the disputed regulations of the Secretary are valid and that Dr. Briehl did not qualify himself for a passport under them. The judgment of the District Court, granting the Secretary's motion for summary judgment is

Affirmed.

WASHINGTON, Circuit Judge (concurring in the result).

The record discloses a "tentative" refusal by the Passport Office to renew Dr. Briehl's passport, and an official determination by that Office not to render a final decision on the matter because of Dr. Briehl's refusal at his hearing to furnish an affidavit, as provided for in Section 51.142 of the Passport Regulations, "with respect to present or past membership in the Communist Party." Unlike the applicant in Robeson v. Dulles, 98 U.S.App.D.C. 313, 235 F.2d 810, certiorari denied, 1956, 352 U.S. 895, 77 S.Ct. 131, 1 L.Ed.2d 86, the appellant in this case has pursued the administrative and judicial steps open to him to raise the question whether the Secretary of State may validly require such an affidavit as a condition precedent to the rendering of a final decision. That question must now be decided.

The Secretary seeks to uphold his power to elicit information as to Communist Party membership as a procedure incident to the substantive power to restrict foreign travel through passport denial. Affidavit requirements of this sort are ordinarily valid if the information elicited is relevant to the exercise of a valid power. Cf. Garner v. Board of Public Works, 1951, 341 U.S. 716, 71 S.Ct. 909, 95 L.Ed. 1317.[1] Implicit in the decisions of this court is the holding that the Secretary possesses a substantial measure of authority to restrict travel by passport denial.[2] While the precise extent of that authority is still in process of being defined, Congress has not been silent or inactive. In the 1941 travel control statute, 8 U.S.C.A. § 1185, Congress provided, in substance, that when the President has proclaimed a national emergency and when he has found that the interests of the United States re-

---

[1] When the Supreme Court in Garner determined that the state agency may properly elicit from city employees information "that may prove relevant to their fitness and suitability for the public service," 341 U.S. at page 720, 71 S.Ct. at page 912, it apparently assumed the proposition that the state agency had power to bar from employment those who are *not* fit or suitable for the public service.

[2] See Shachtman v. Dulles, 1955, 96 U.S. App.D.C. 287, 225 F.2d 938; Boudin v. Dulles, 1956, 98 U.S.App.D.C. 305, 235 F.2d 532; Dayton v. Dulles, 1956, 99 U.S.App.D.C. 47, 237 F.2d 43; cf. Kraus v. Dulles, 1956, 98 U.S.App.D.C. 343, 235 F.2d 840. The highly restrictive position taken by Judge Bazelon in his learned dissent is opposed to the spirit if not the letter of these decisions. But it may be agreed that further congressional action in the passport field would be very desirable.

quire additional restrictions on the departure of persons from the United States, it shall be unlawful for a citizen to leave the country without a valid passport. As Judge Prettyman points out, this statute has become operative. I read it as having been intended to authorize the Secretary to control, by passport denial, the travel of those whose journeying abroad is reasonably found to be contrary to the interests of the United States.

In the Internal Security Act of 1950, Congress made the following legislative finding, whose validity today can hardly be subject to challenge:

> "Due to the nature and scope of the world Communist movement, with the existence of affiliated constituent elements working toward common objectives in various countries of the world, travel of Communist members, representatives, and agents from country to country facilitates communication and is a prerequisite for the carrying on of activities to further the purposes of the Communist movement." 50 U.S.C.A. § 781(8).

Congress implemented that finding by Section 6 of the Internal Security Act, 50 U.S.C.A. § 785, a provision which the framers of the Act no doubt thought would come into effect at a much earlier date than in fact has proved possible. But the congressional finding remains as an admonition to the executive branch to use its authority in all lawful ways to control the "travel of Communist members, representatives, and agents" so as not to facilitate communication or otherwise "further the purposes of the Communist movement." Therefore, I have no doubt that the Secretary has the power—in some cases at least—to deny passports on grounds to which past or present membership in the Communist Party "may prove relevant." Garner,

supra, 341 U.S. at page 720, 71 S.Ct. at page 912.

It must be admitted, I think, that the affidavit requirement does infringe Dr. Briehl's interest in maintaining privacy and upon interests protected by the First Amendment.[3] But if the interests of the public are also involved, the problem is "to determine which of these two conflicting interests demands the greater protection under the particular circumstances presented." American Communications Ass'n v. Douds, supra, 339 U.S. at page 399, 70 S.Ct. at page 684. The information as to Communist Party membership is asked for in connection with a passport application and might prove relevant to a valid denial of a passport. Under all the circumstances, it seems clear that the benefit to the public order, in having information of this sort available to the Secretary to enable him to exercise his lawful authority, substantially outbalances any abridgement of individual interests that may result. As Mr. Justice Murphy observed, concurring in West Virginia State Board of Education v. Barnette, 1943, 319 U.S. 624, 645, 63 S.Ct. 1178, 1188, 87 L.Ed. 1628: "The right of freedom of thought and of religion as guaranteed by the Constitution against State action includes both the right to speak freely and the right to refrain from speaking at all, *except insofar as essential operations of government require it for the preservation of an orderly society,*—as in the case of compulsion to give evidence in court." (Emphasis supplied.) In the exercise of his powers over the granting or withholding of passports, the Secretary is similarly entitled to relevant information.

For these reasons, I find no infirmity in the statutory and regulatory system which authorizes the Secretary to withhold a passport from any person who, by refusing to furnish the required affidavit, fails to complete his application.[4] Ap-

---

3. See American Communications Ass'n v. Douds, 1950, 339 U.S. 382, 402, 70 S.Ct. 674; see also United States v. Rumely, 1953, 345 U.S. 41, 56, 73 S.Ct. 543, 97 L. Ed. 770.

4. 22 U.S.C.A. § 213 requires every passport applicant to furnish under oath an application containing "a true recital of each and every matter of fact which may be required by law or by any rules

pellant has not suggested any reason or rule of law that would require a governmental agency to proceed to hear and determine on its merits the claim of a person seeking to exercise a right or privilege, when the claimant declines to file a complete application, as required by statute or by a regulation having—like the present one—the force of law.[5] Surely if a person desiring to vote declines to answer a question which may prove relevant to a valid ground of denial —such as his age, or where and when he last voted—an election board may there-. upon refuse to permit him to vote until the question is answered, and need not make a considered determination that in fact he is ineligible. And even if the decision to deny a right could be said to require an exercise of discretion, I do not see why the decision-maker must act in spite of the fact that he has not received answers to relevant questions which were properly asked, and which may provide information necessary for a proper decision.

It is important to bear in mind the distinction, which the Supreme Court pointed out in Konigsberg v. State Bar of California, 1957, 353 U.S. 252, 77 S.Ct. 722, 1 L.Ed.2d 810, between the two courses of governmental action that can follow a refusal to answer a particular question propounded by a government agency. In Konigsberg, an adverse inference was drawn from a refusal to answer, and governmental action—denial of bar membership—was based in part on this inference. The Court held the inference to be unreasonable, since the refusal appeared to be based on a good faith reliance on a constitutional privi-

lege and therefore would not necessarily give rise to the adverse inference which the State had drawn. On the other hand, in the case at bar, no adverse inference was drawn from a refusal to answer. Here the government agency asserted its right to have certain information which was relevant to the exercise of valid authority, and declared in advance that it would not proceed until the information was forthcoming. This is precisely the sort of situation which the Court in Konigsberg contrasted with the inference-drawing approach that had been used there. As to this situation, the Court indicated that a serious First Amendment question would be raised, as has been recognized in this opinion, and that there would be a question of fairness if the applicant were not warned of the consequence of failure to answer. Here the regulations plainly indicate the result of a refusal to answer.

At this stage we are concerned only with a request for identification of affiliation *vel non*, unaccompanied by any direct penalty stemming from such identification. "No doubt issues like those now before us cannot be completely severed from the political and emotional context out of which they emerge. For that very reason adjudication touching such matters should not go one whit beyond the immediate issues requiring decision." American Communications Ass'n v. Douds, supra, 339 U.S. at page 416, 70 S.Ct. at page 693 (Frankfurter, J., concurring in part). The question whether past or present membership in the Communist Party is in itself sufficient to support denial of a passport is not before us: there has not here been a denial based on such membership.[6]

authorized by law." See also 22 C.F.R. 51.14. Section 51.142 of the regulations authorizes the affidavit, and Section 51.74 specifies that the affidavit "shall be considered as, and become, a part of the application."

5. The thrust of appellant's argument is that the issuance of a passport is being unlawfully conditioned upon the requirement of a "test oath." But as the Supreme Court pointed out in Garner,

supra, entirely different issues are raised by a requirement that certain conduct or affiliation be denied under oath, and by a requirement that information "with respect to" a stated subject matter be given.

6. See Garner, supra 341 U.S. at page 720, 71 S.Ct. at page 912: "The affidavit raises the issue whether the City of Los Angeles is constitutionally forbidden to require that its employees disclose their past or present membership in the Com-

It is also unnecessary and inappropriate for us to decide such questions as whether the Secretary's regulations are in every particular valid, whether he is justified in using confidential information, whether he must always hold a hearing, and the like. We need not in the present case attempt fully to define the scope of the Secretary's power, or that of the courts. We should do no more than decide the question actually before us.

BAZELON, Circuit Judge, with whom EDGERTON, Chief Judge, concurs (dissenting).

The Secretary of State says his regulations, pursuant to which he denies passports to persons who "support the Communist movement," are a valid exercise of discretion delegated to him by the President. I think they are invalid because (1) the President did not undertake to delegate the discretion the Secretary claims and (2) the President himself did not have this discretion.

For many years the Secretary of State has claimed an unlimited discretion to deny passports.[1] During the greater part of our history, when a passport was merely a comfort to the traveller, but not a necessity,[2] his claim went unchallenged. Since 1941, however, a passport has been a travel necessity,[3] and when the Secretary began denying or revoking passports on such grounds as "activities contrary to the best interests of the United States," or Communist membership or support, applicants turned to the courts for relief.[4]

Bauer v. Acheson, D.C.1952, 106 F. Supp. 445, was the first reported case. There the Secretary based his authority on the President's inherent foreign relations power, and on the provision of 22 U.S.C.A. § 211a that the Secretary "may grant * * * passports * * * under such rules as the President shall designate and prescribe * * *." The court held there was no authority to refuse or revoke a passport without notice and hearing. Less than two months later and presumably as a result of that decision, the Secretary promulgated the regulations now before us, declaring Communist supporters ineligible for passports and es-

munist Party * * *. *Not before us is the question whether* the city may determine that an employee's *disclosure* of such political affiliation *justifies his discharge.*" (Emphasis supplied.)

1. See 3 Hackworth, Digest of International Law § 268 (1942).

2. Shachtman v. Dulles, 1955, 96 U.S.App. D.C. 287, 289–290, 225 F.2d 938, 940–941.

3. Actually the first requirement of a passport for travel was during World War I. Act of May 22, 1918, 40 Stat. 559, 22 U.S.C.A. §§ 223–226b, Proclamation No. 1473, Aug. 8, 1918, 40 Stat. 1829. These controls expired March 3, 1921. Pub. Res. No. 64, 41 Stat. 1359. By Act of June 21, 1941, 55 Stat. 252, 22 U.S. C.A. § 223, Congress amended the 1918 Act to apply during a proclaimed emergency and, on November 14, 1941, the President issued Proclamation No. 2523, 55 Stat. 1696, U.S.Code Cong.Service 1941, p. 883, restoring travel controls which have remained in effect since then. The 1941 statute was replaced by § 215

of the Immigration and Nationality Act of 1952, 66 Stat. 190, 8 U.S.C.A. § 1185, and on January 17, 1953, the revised statutory authority was invoked by Proclamation No. 3004, 67 Stat. C31, U.S. Code Cong. and Adm.News 1953, p. 915.

In addition to being legally required as an exit permit, a passport has become a practical necessity because foreign countries have increasingly been requiring it as a condition to entry. See Shachtman v. Dulles, 96 U.S.App.D.C. at page 290, 225 F.2d at page 941; Bauer v. Acheson, D.C., 1952, 106 F.Supp. 445, 451; Comment, 61 Yale L.J., infra note 28, at pages 171–172.

4. See, for example, Bauer v. Acheson, supra note 3; Dulles v. Nathan, 1955, 96 U.S.App.D.C. 190, 225 F.2d 29; Shachtman v. Dulles, supra note 2; Boudin v. Dulles, 1956, 98 U.S.App.D.C. 305, 235 F.2d 532; Robeson v. Dulles, 1956, 98 U.S.App.D.C. 313, 235 F.2d 810, certiorari denied, 1956, 352 U.S. 895, 77 S. Ct. 131, 1 L.Ed.2d 86; Dayton v. Dulles, 1956, 99 U.S.App.D.C. 47, 237 F.2d 43.

tablishing a notice and hearing procedure.[5] *Until then, the only substantive passport qualification ever imposed by any statute[6] or regulation was citizenship.*[7]

As authority for his new regulations, the Secretary relied on 22 U.S.C.A. § 211a,[8] the same statute he had relied on in Bauer. He continued this reliance in later cases. In the present case he says: "In the light of the broad language of this statute, there is no occasion here to determine whether the President's plenary executive power over foreign affairs in itself furnishes sufficient authority to the Secretary to deny passports to American citizens in accordance with the reasonable standards prescribed by him."[9] But he adds that "if some additional source of authority were needed, it is supplied by the travel control statutes which Congress has repeatedly enacted";[10] and "the language of the [travel control] statute makes it plain that during [a proclaimed emergency] this authorization becomes incorporated, in effect, into § 211a itself."

But in Stewart v. Dulles, 100 U.S.App.D.C. ——, 248 F.2d 602, briefed and argued after the present case and now awaiting decision, the Secretary conceded that § 211a "confers no substantive power," and he "assume[d]" that he "had no authority to impose this kind of direct restraint upon travel." "It was for this very reason," he said, "that Congress enacted what is now 8 U.S.C.A. § 1185, authorizing the President, in times of war or national emergency, to use his inherent powers in the field of passport issuance as a means of directly controlling the travel of citizens." The argument now is that (1) 22 U.S.C.A. § 211a and the inherent executive power, though ineffective to control travel, give the Secretary discretion as to passport issuance; and (2) under 8 U.S.C.A. § 1185, upon proclamation of an emergency by the President, any person to whom the Secretary, in his discretion, refuses a passport, may not leave the country. Thus, the Secretary claims that Congress has delegated to him, through the President, the power to establish categories of persons ineligible to leave the country.

## I.

### *The Claimed Delegation*

The authority conferred on the President by 22 U.S.C.A. § 211a was exercised through Executive Order No. 7856, on March 31, 1938.[11] The Executive Order designated only one general category of passport eligibility, that created by 22 U.S.C.A. § 212, namely, persons who are citizens of the United States. 22 C.F.R. § 51.2 (1949). Beyond that, the order confined itself to specifying the formal requirements of the passport application (e.g., the type and size of photographs to be attached),

---

5. 17 Fed.Reg. 8013, Sept. 4, 1952, 22 C.F.R. §§ 51.135–51.143 (1957 Supp.).

6. Section 6 of the Internal Security Act of 1950, 64 Stat. 993, 50 U.S.C.A. § 785, which makes it a crime for a "member of [a Communist] organization" to apply for or use a passport, is inoperative until such an organization has registered or been finally ordered to do so. Neither of these events has occurred. Communist Party v. Subversive Activities Control Board, 1956, 351 U.S. 115, 76 S.Ct. 663, 100 L.Ed. 1003, reversing, 1954, 96 U.S.App.D.C. 66, 223 F.2d 531.

7. The Act of May 30, 1866, 14 Stat. 54, disqualified noncitizens. By Act of June 14, 1902, 32 Stat. 386, the law was amended to disqualify persons not owing allegiance to the United States, "whether citizens or not." The amendment was designed to cover citizens of Puerto Rico, Hawaii, and the Philippines. 35 Cong. Rec. 5697–99, 6588–89, 57th Cong., 1st Sess. (1902). The statute is now codified as 22 U.S.C.A. § 212. For convenience, the class of eligibles will be referred to herein as "citizens."

8. 22 C.F.R. p. 98 (1957 Supp.); 17 Fed. Reg. 8013.

9. See also the Secretary's brief in Boudin v. Dulles, supra note 4, at p. 16.

10. Supra note 3.

11. 3 Fed.Reg. 799, 22 C.F.R. §§ 51.1–51.77 (1949).

id., § 51.23q, and the evidence of citizenship to be furnished, and providing for amendment, renewal and extension of passports and specifying the fees to be collected. In addition, it authorized the Secretary of State, "in his discretion to refuse to issue a passport * * *" and "to make regulations * * * additional to the rules in this part and not inconsistent therewith." Id., §§ 51.-75, 51.77. Pursuant to this latter authority, the Secretary, on the day of the President's order, issued Departmental Order 749, promulgating the Department's regulations, consisting merely of procedural implementation of the President's rules.[12]

The regulations in question in the present case, which the Secretary added four years later and after the Bauer decision, were the first attempt, by regulations issued under 22 U.S.C.A. § 211a, to affect anything more than procedure or form.[13] In view of the purely procedural nature of the President's rules, his accompanying grant to the Secretary of authority to make "additional * * * and not inconsistent" regulations confers no power to create substantive disqualifications.

Nor did the President's Proclamation No. 3004,[14] making operative the travel control provision of 8 U.S.C.A. § 1185, give the Secretary this authority. Section 1185 prohibits departure from the United States without a valid passport during a proclaimed emergency, "except as otherwise provided by the President and subject to such limitations and exceptions as the President may authorize and prescribe * * *." When the proclamation was issued, regulations existing under an earlier proclamation were in force, providing generally that no person could enter or leave the country without a valid passport, except for travel to and from certain countries. 22 C.F.R. §§ 53.1–53.9 (1949). Proclamation No. 3004 did not undertake to grant power to the Secretary to control travel by establishing additional categories of passport ineligibility. It merely declared that departure and entry would be subject to the already *established travel control regulations, 22 C.F. R. §§ 53.1–53.9, referring to them specifically and incorporating them into the proclamation.*[15] It added an authorization to the Secretary "to revoke, modify or amend such regulations as he may find the interests of the United States to require." This authorization, like the authorization of Executive Order No. 7856 to issue "additional" *passport* regulations, must be read in its context. Thus read, it grants the Secretary discretion of the type already exercised in his existing travel control regulations, namely, to determine which parts of the world can be visited by Americans only if they have passports, but not to determine which Americans are to receive passports.

Thus neither Executive Order No. 7856, which confers upon the Secretary authority received by the President under 22 U.S.C.A. § 211a, nor Proclamation No. 3004, which confers upon the Secretary authority the President holds under 8 U.S.C.A. § 1185, undertakes to delegate to the Secretary any power to create substantive passport disqualifications.

12. 22 C.F.R. §§ 51.101–51.134 (1949); and see source note at p. 103. "A study of the executive order and the departmental order indicates that the chief element in the discretion exercised by the Secretary of State concerned the type of proof required to establish citizenship or allegiance." Note, 41 Geo.L.J., infra note 28, at 76.

13. See Department of State, The American Passport, ch. IV (1898); Exec.Order No. 654, June 13, 1907; Exec.Order No. 4359–A, Dec. 19, 1925; Exec.Order No. 4382–A, Feb. 12, 1926; Exec.Order No. 4488, Aug. 3, 1926; Exec.Order No. 5860, June 22, 1932; Exec.Order No. 6650, March 23, 1934.

14. Supra note 3.

15. The regulations involved in this case, which were also in existence when the proclamation was issued, were not referred to directly or indirectly.

Nor could the President delegate such power, for neither statute conferred it upon him.

## II.

### *The President's Statutory Power*

### A. The Passport Statutes Do Not Purport to Confer the Power Here Claimed.

Section 211a of 22 U.S.C.A. says nothing about categories of ineligibility. Indeed, the Secretary concedes that the purpose of the Act of August 18, 1856,[16] from which § 211a derives, was to prohibit passport issuance by anyone other than the Secretary of State. Nothing in the legislative history of the 1856 statute suggests that the words "may grant and issue" confer power to set up substantive categories of ineligibility. From the little that history reveals, it appears that the purpose of Congress was merely to control the procedure of passport issuance.[17] Fairly read § 211a grants the Executive only such discretion as may be necessary for elaborating a procedure for issuing passports, e.g., as to the type and quantum of evidence of citizenship.[18] And so the statute was read by our Presidents in former times.[19]

Nor did 8 U.S.C.A. § 1185 authorize the President to create such substantive passport disqualifications as are contained in the regulations before us. Subsection (a) of § 1185 did not purport to give the President power to establish criteria for restricting anyone's right to travel. It merely authorized him to invoke restrictions set forth in the statute if he found that "those provided otherwise than by this section" were inadequate to protect the public safety. Moreover, when the Act was first adopted in 1918 and when it was reenacted in 1941,[20] there were no restrictions on citizens' travel "provided otherwise than by this section." What Congress had in mind, therefore, in § 1185(a), was the problem of movements of *aliens,* not citizens. And Congress set forth, in subparagraphs (1) through (7) of subsection (a), a system of exit and entry permits to control movements of aliens.

It is subsection (b) of § 1185 which is relevant to citizens. That subsection provided that, upon issuance of the President's proclamation, "it shall, except as otherwise provided by the President, and subject to such limitations and exceptions as the President may authorize and prescribe, be unlawful for any citizen to depart from or enter, or attempt to depart from or enter, the United States unless he bears a valid passport." Thus citizens were forbidden to travel without passports, but the President was authorized to establish conditions and exceptions to this prohibition. But the subsection did not authorize the President to decide which categories of citizens might receive passports.

Though neither 22 U.S.C.A. § 211a nor 8 U.S.C.A. § 1185 explicitly confers the authority the Secretary claims, he urges us to read them through a wide lens and find in them a congressional intent to authorize his regulations. His contention comes to this, that Congress has by implication, though not expressly, authorized the Executive to decide which Americans shall be confined within our boundaries. In my opinion such an intention may not be read into the statutes because (1) it would conflict with other expressions of congressional policy and (2) it would raise grave constitutional doubts.

16. 11 Stat. 60; reenacted in substantially the same form by the Act of July 3, 1926, c. 772, § 1, 44 Stat. 887. The language of the original act was "shall be authorized to grant" rather than "may grant," but the effect is the same.

17. Comment, 23 U.Chi.L.Rev., infra note 28, at 272 n. 25; Doman, A Comparative Analysis: Do Citizens Have the Right to Travel, 43 A.B.A.J. 307, 308 (1957).

18. The original 1856 Act, 11 Stat. 60, combined the present § 211a with the present § 212 which disqualifies non-citizens.

19. Supra note 13.

20. Supra note 3.

## B. The Secretary's Reading of the Statutes Conflicts with Congressional Policy.

Almost a century ago, Congress declared that "the right of expatriation is a natural and inherent right of all people, indispensable to the enjoyment of the rights of life, liberty, and the pursuit of happiness," and decreed that "any declaration, instruction, opinion, order, or decision of any officers of this government which denies, restricts, impairs, or questions the right of expatriation, is hereby declared inconsistent with the fundamental principles of this government." 15 Stat. 223–224 (1868), R.S. § 1999, 8 U.S.C. § 800 (1940).[21] Although designed to apply especially to the rights of immigrants to shed their foreign nationalities, that Act of Congress "is also broad enough to cover, and does cover, the corresponding natural and inherent right of American citizens to expatriate themselves." Savorgnan v. United States, 1950, 338 U.S. 491, 498 note 11, 70 S.Ct. 292, 296, 94 L.Ed. 287.[22] The Supreme Court has held that the Citizenship Act of 1907 and the Nationality Act of 1940 "are to be read in the light of the declaration of policy favoring freedom of expatriation which stands unrepealed." Id., 338 U.S. at pages 498–499, 70 S.Ct. at page 296. That same light, I think, illuminates 22 U.S.C.A. § 211a and 8 U.S.C.A. § 1185. Since expatriation is today impossible without leaving the country,[23] the policy expressed by Congress in 1868 and never repealed precludes a reading of the passport and travel control statutes which would permit the Secretary of State to prevent citizens from leaving.

The Secretary's construction of the statutes would impinge also upon the Internal Security Act of 1950.[24] Congress there made it unlawful for a member of a Communist organization to apply for or use a passport, but only after such organization has registered under the Act or has been finally ordered to do so. Neither of those events has occurred.[25] Moreover, the prohibition was circumscribed by procedural safeguards not found in the Secretary's "Communist supporter" regulations involved here; and it was substantively limited to "members" of the proscribed organization, whereas the Secretary's regulations apply "regardless of the formal state of [the applicant's] affiliation with the Communist party * * *."[26] These declarations of congressional policy make it unlikely that by other statutes Congress intended to authorize a different policy.[27] "The legislative process is especially qualified and the administrative process is especially unfit for the determination of major policies that depend more upon emotional bent and political instincts than upon investigation, hearing and analysis." Davis, Administrative Law 57 (1951).

I would not construe the statutes as conferring upon the Secretary by implication broad powers which they do not explicitly confer, United States v. Minker, 1956, 350 U.S. 179, 190, 76 S.Ct. 281, 100 L.Ed. 185, especially when serious restraints on liberty are entailed. Ex parte Endo, 1944, 323 U.S. 283, 299–300, 65 S.Ct. 208, 89 L.Ed. 243.

21. This act, though no longer included in the United States Code, has not been repealed and is still in effect. Savorgnan v. United States, 1950, 338 U.S. 491, 498–499, 70 S.Ct. 292.

22. See also op. cit. supra note 1, p. 163.

23. 8 U.S.C.A. §§ 1481 and 1483; Savorgnan v. United States, 338 U.S. at page 503, 70 S.Ct. at page 298.

24. Supra note 6.

25. Ibid.

26. In the last session of Congress, legislation was introduced by Representative Walter, which would have amended the Administrative Procedure Act, 5 U.S.C.A. § 1001 et seq. to provide for a passport review procedure and would have denied passports to persons under Communist discipline in much the fashion now employed by the State Department. The bill died in committee. H.R. 9991, 102 Cong.Rec. 4266, 84th Cong., 2d Sess., March 15, 1956.

27. See Note, 41 Geo.L.J., infra note 28, at page 89.

## C. The Secretary's Reading of the Passport Statutes Is Constitutionally Doubtful.

The broad construction the Secretary would have us place on the passport statutes would raise grave constitutional doubts.[28] Statutes must be construed narrowly if to do so avoids a serious constitutional question. United States v. Rumely, 1953, 345 U.S. 41, 46, 73 S.Ct. 543, 97 L.Ed. 770; United States v. Witkovich, 353 U.S. 194, 77 S.Ct. 779, 1 L.Ed.2d 765.

We recognized in Shachtman that the individual's right to travel is a natural right protected by the Constitution.[29] Since denial of a passport now abridges that right, passport applicants are entitled to both the procedural[30] and substantive[31] safeguards of the Fifth Amendment. The broad interpretation urged by the Secretary would require us to decide whether it is consistent with due process of law, and with First Amendment rights,[32] to deprive an individual of so large a part of his liberty under the standards and procedures the Secretary employs; and whether, if Congress possesses such power, it may validly delegate to the Secretary or the President a "discretion * * * unconfined and vagrant * * * [not] canalized within banks that keep it from overflowing." [33]

The word "Communist" is not an incantation subverting at a stroke our Constitution and all our cherished liberties. If today the threat of Communism justifies confining within our boundaries any citizen who will not swear that he is not a Communist,[34] tomorrow the same

28. Comment, The Passport Puzzle, 23 U. Chi.L.Rev. 260 (1956); Note, Passports and Freedom of Travel: The Conflict of a Right and a Privilege, 41 Geo.L.J. 63, 88 (1952); Note, "Passport Denied": State Department Practice and Due Process, 3 Stan.L.Rev. 312 (1951); Parker, The Right to Go Abroad: To Have and to Hold a Passport, 40 Va.L. Rev. 853, 870 (1954); Passport Refusals for Political Reasons: Constitutional Issues and Judicial Review, 61 Yale L.J. 171 (1952).

29. 96 U.S.App.D.C. at page 290, 225 F.2d at page 941. See also Williams v. Fears, 1900, 179 U.S. 270, 274, 21 S.Ct. 128, 130, 45 L.Ed. 186, referring to "freedom of egress from the state."

30. Dayton v. Dulles, supra note 4; Boudin v. Dulles, supra note 4; Bauer v. Acheson, supra note 3; see also Dulles v. Nathan, supra note 4, remanding Nathan v. Dulles, D.C.1955, 129 F.Supp. 951, for vacation of judgment and dismissal of complaint on ground of mootness.

31. Shachtman v. Dulles, supra note 2; see Kraus v. Dulles, 1956, 98 U.S.App. D.C. 343, 235 F.2d 840.

32. In saying in the Communist Party case "that the Government may validly decline" a passport to a Communist, this court was referring to the passport in its aspect as a documentary assurance of "the protection and good offices of American diplomatic and consular officers abroad," 1954, 96 U.S.App.D.C. 66, 90, 223 F.2d 531, 555, and not as an exit permit indispensable to travel. As for the latter aspect of a passport, i. e., whether a restriction upon liberty to travel is constitutional, the court said, "* * * we need not, and do not, enter upon consideration of that question * * *." 96 U.S.App.D.C. at page 91, 223 F.2d at page 556. Later in Shachtman, the court did consider that question and concluded, as we have already seen, that there is a constitutionally protected right, supra note 29; but how much protection springs from the First Amendment has not been determined.

33. Mr. Justice Cardozo dissenting in Panama Refining Co. v. Ryan, 1935, 293 U.S. 388, 440, 55 S.Ct. 241, 256, 79 L.Ed. 446. The Secretary argues that standardless delegation is not invalid in a field where the Executive possesses inherent power, citing United States v. Curtiss-Wright Export Corp., 1936, 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255. As I shall show, however, the delegation problem cannot thus be avoided, for the authority here claimed is not encompassed within the President's inherent power in the field of foreign relations.

34. The majority finds "nothing new or novel about requiring an applicant for a permit or a license to supply pertinent information under oath." [248 F.2d 574] But the analogy sought to be established founders upon the hard fact that the passport applicant does not seek a permit or a license—he seeks to

logic will justify control of movement from one state to another, for that is no less useful in communication than travel abroad. By no great extension of the court's reasoning, an oath can be required as a condition to the enjoyment of every other right we have. Food, clothing, shelter, education, recreation—all help to sustain the individual, develop his powers, and make him a more dangerous antagonist.

The due process problem is not avoided by reliance upon Galvan v. Press, 1954, 347 U.S. 522, 74 S.Ct. 737, 98 L.Ed. 911; nor the First Amendment problem by reliance upon American Communications Ass'n v. Douds, 1950, 339 U.S. 382, 70 S.Ct. 674, 94 L.Ed. 925.

In holding in Galvan that Congress could constitutionally provide for deportation of an alien who becomes a Communist after entry, the Supreme Court said: "The power of Congress over the admission of aliens and their right to remain is necessarily very broad, touching as it does basic aspects of national sovereignty, more particularly our foreign relations and the national security." [35] The greater power which the Government possesses in respect of aliens [36] may legitimatize treatment which could not lawfully be directed against citizens. Galvan provides no constitutional basis for banishing a *citizen* who becomes a Communist.

So far as the First Amendment problem is concerned, whether we apply the "clear and present danger test,"[37] or some aspect of the "reasonable relation" test,[38] we are engaged in weighing the individual's need to be free against the Government's need to restrain him. Each case is bound to turn on the nature of the freedom involved, the public detriment it conflicts with and the type of restraint imposed. It is unlikely that a case arising in one context will determine a case arising in another. Douds falls far short of determining our present problem.

In Douds the Court upheld the constitutionality of § 9(h) of the National Labor Relations Act, 29 U.S.C.A. § 159 (h), withdrawing N.L.R.B. privileges from unions whose officers fail to submit non-Communist affidavits. The Court found that, since unions are clothed by Federal law with great powers for good or evil, "the public interest in the good faith exercise of that power is very great." 339 U.S. at pages 401–402, 70 S.Ct. at page 686. It observed that (1) "Section 9(h) touches only a relative handful of persons, leaving the great majority of persons of the identified affiliations and beliefs completely free from restraint," *id.* 339 U.S. at page 404, 70 S.Ct. at page 687; (2) there is no constitutional right to occupy the position of a labor leader in the sense that "the loss of [the] particular position [would be] the loss of life or liberty," *id.* 339 U.S. at page 409, 70 S.Ct. at page 689; (3) § 9(h) imposes no direct restraint on freedom of belief or association, since its "discouragements" operate "only against the combination of [particular] affiliations or beliefs with occupancy of a position of great power over the economy of the country," *id.* 339 U.S. at pages 403–404, 70 S.Ct. at page 686;[39] and (4)

---

implement a constitutionally protected *right.* The requirement of the affidavit is also sought to be defended by analogy to ordinary pleading rules. But this analogy also collapses. Pleadings may be in the alternative; they may be inconsistent or hypothetical; they are not under oath. A defendant is not required to submit to a test oath as a qualification of his right to receive justice.

**35.** 347 U.S. at page 530, 74 S.Ct. at page 742.

**36.** See discussion at note 90 infra and related text.

**37.** Thomas v. Collins, 1945, 323 U.S. 516, 532, 65 S.Ct. 315, 323, 89 L.Ed. 430.

**38.** Dennis v. United States, 1951, 341 U.S. 494, 510, 71 S.Ct. 857, 95 L.Ed. 1137, adopting the statement of Chief Judge Hand below, United States v. Dennis, 2 Cir., 1950, 183 F.2d 201, 212.

**39.** See also the concurring opinion of Mr. Justice Jackson.

§ 9(h), if not complied with, makes it not impossible, but only more difficult for unions to remain effective, *id.* 339 U.S. at page 390, 70 S.Ct. 679.[40]

Whether travel by Communists is a danger on a par with their occupancy of powerful union offices is at least questionable. Prevention of travel does not prevent communication. Conspirators could still use the mails, cables, telephones, radio and, not least, foreign embassies and consulates in the United States. The discomfiture of a few individuals who would have to send messages rather than make speeches [41] may not, in the constitutional balancing process outweigh the citizen's right to travel. On the other side of the scales, it appears that (1) the passport statutes, unlike that in Douds, touch not a handful of persons, but many thousands (in the Secretary's view, as many thousands as he may choose to suspect); (2) unlike the statute in Douds, these involve a constitutionally protected right to travel; (3) they not only impose what Douds called an *indirect* restraint on First Amendment rights by "discouragement" of freedom of belief and association, but also *directly* affect the right to travel which may itself be a First Amendment right;[42] and (4) these statutes make travel not difficult, but impossible.

If the design of the passport statutes, in depriving an individual of the right to travel, is to prevent him from making statements abroad critical of or embarrassing to our policies, or offensive to our political taste, they are the very type of legislation the First Amendment forbids. Thomas v. Collins, 1945, 323 U.S. 516, 65 S.Ct. 315; Near v. Minnesota, 1931, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357.[43] If the statutes bar travel on account of "political affiliations and beliefs," they are expressly condemned in Douds: "[such] circumstances [are] ordinarily irrelevant to permissible subjects of governmnent action." 339 U.S. at page 391, 70 S.Ct. at page 680. It is most frequently argued, in justification of the power the Secretary claims, that travel of Communists may serve to promote an international conspiracy. Whether, under the Douds[44] reasoning, that possibility justifies these regulations and puts to rest the constitutional doubts that arise is open to serious question.

Another alleged reason for abrogating the constitutional right to travel is that the American abroad may not only talk, but may also act in ways that conflict with our policies and interests and tend to cause international incidents. The Secretary of State embodies that reason in § 51.136 of his regulations,[45] which is

---

40. That some unions have remained powerful and effective without the privileges of the Labor Relations Act is common knowledge.

41. One of the individuals who has sought in vain for many years to go abroad was recently reported to have sent a "cordial message of greetings" to the Soviet Union which was published in the Communist Party newspaper Pravda, and broadcast by the Moscow radio. N.Y. Times, Jan. 2, 1957, p. 16, col. 6. "Spies and traitors do not usually travel abroad. Rather, they remain inconspicuously at home, as recent unfortunate cases have amply demonstrated." Parker, op. cit. supra note 28 at 873.

42. Wyzanski, Freedom to Travel, The Atlantic Monthly, Oct. 1952, 66, 68.

43. Ibid.

44. See also Communist Party v. Subversive Activities Control Board, supra note 32.

45. *"Limitations on issuance of passports to certain other persons.* In order to promote and safeguard the interests of the United States, passport facilities, except for direct and immediate return to the United States, will be refused to a person when it appears to the satisfaction of the Secretary of State that the person's activities abroad would: (a) violate the laws of the United States; (b) be prejudicial to the orderly conduct of foreign relations; or (c) otherwise be prejudicial to the interests of the United States." 22 C.F.R. § 51.136 (Supp. 1957).

not invoked in this case.

During a recent visit to the United States by a foreign chief of state at the invitation of the President, an American mayor declared that the guest was unwelcome in his city. That announcement could hardly have been more prejudicial to our foreign relations if the mayor had been abroad when he made it. Yet no one has suggested that he could constitutionally have been prevented from making his announcement. At home our citizens are as free to do lawful acts as they are to speak their minds. The expectation that they may do things abroad which violate no laws is, I think, an insufficient basis for abrogating their right to leave the country.

If it is the fear of *illegal* conduct which purportedly justifies travel restriction, a factor which may tip the constitutional scale is "the availability of more moderate controls than those which the state has imposed." Mr. Justice Frankfurter, concurring in Dennis v. United States, 1951, 341 U.S. 494, 542, 71 S.Ct. 857, 95 L.Ed. 1137, quoting Freund, On Understanding the Supreme Court. There are penal sanctions against the commission or the attempt or conspiracy to commit espionage, sabotage, treason, sedition and subversion.[46] The Internal Security Act deals with conspiracies to do anything which would substantially contribute to the establishment of a foreign-directed totalitarian dictatorship.[47] For persons who become or remain members of the Communist Party with knowledge, of its violent objectives, we have the Communist Control Act of 1954.[48] We have statutes dealing with persons who act as agents of a foreign government,[49] or those who have "correspondence" with a foreign government with intent to influence its measures in relation to disputes or controversies with our Government, or to defeat the measures of the United States.[50] Our law even prohibits leaving the country with intent to avoid prosecution or punishment for certain listed offenses or to avoid giving testimony in certain criminal proceedings.[51] In that they require proof of criminality and provide trial by jury, these statutes, despite their severe penalties, are more moderate controls than those the Secretary imposes. He claims that the peril involved in the possible machinations of such persons would justify a statute permitting him to deprive them of the right to travel even though he has no evidence which would justify prosecuting them under any of the penal statutes. I think it very doubtful that a statute could constitutionally grant the power to confine citizens to the country in such circumstances.[52]

---

46. 18 U.S.C. §§ 371, 791–97, 2151–56, 2381–90.

47. 50 U.S.C.A. § 783.

48. Id., § 843.

49. 18 U.S.C. § 951.

50. Id., § 953.

51. Id., § 1073.

52. It has been observed that, since the common law attributes to personal liberty, according to Blackstone, "the power of locomotion, of changing situation, or moving one's person to whatsoever place one's own inclinations may direct," "the distinction between restriction to a jail, to a city, to a state, or to a nation is merely one of degree." Comment, 61 Yale L.J. supra note 28, at 190; see also Doman, op. cit. supra note 17 at 310.
Constitutional safeguards are "especially necessary where the occasion of detention is fear of future misconduct, rather than crimes committed." Mr. Justice Jackson, dissenting in Shaughnessy v. U. S. ex rel. Mezei, 1953, 345 U.S. 206, 225, 73 S.Ct. 625, 97 L.Ed. 956. In other legal systems, as Mr. Justice Jackson points out, other considerations may govern. He cites the testimony of Hermann Göring at the Nuremburg trials:

" * * * those who had committed some act of treason against the new state, or those who might be proved to have committed such an act, were naturally turned over to the courts. The others, however, of whom one might expect such acts, but who had not yet committed them, were taken into protective custody, and these were the people who were taken to concentration camps. * * * Likewise, if for political reasons * * * someone was taken into

Section 1732 of 22 U.S.C.A. calls upon the President to "use such means, not amounting to acts of war, as he may think necessary and proper to obtain or effectuate the release" of an American citizen "unjustly deprived of his liberty by or under the authority of any foreign government." The majority says that since "an American with Communist affiliations" who gets into trouble abroad through his "political indiscretion" may invoke this statute, the Secretary of State must have the power to prevent the citizen from going abroad. But the American who becomes embroiled with foreign authorities can only request the aid of his Government; he cannot compel it. United States ex rel. Keefe v. Dulles, 1954, 94 U.S.App.D.C. 381, 384–385, 222 F.2d 390, 393–394, certiorari denied, 1955, 348 U.S. 952, 75 S.Ct. 440, 99 L.Ed. 743.

That the purported need to confine citizens to the country is claimed to spring from emergency conditions does not dispense with their constitutional rights.[53] Mr. Justice Jackson pointed out in his concurring opinion in Youngstown Sheet & Tube Corp. v. Sawyer, 1952, 343 U.S. 579, 649–650, 72 S.Ct. 863, 877, 96 L.Ed. 1153:

"The appeal, however, that we declare the existence of inherent powers *ex necessitate* to meet an emergency asks us to do what many think would be wise, although it is something the forefathers omitted. They knew what emergencies were, knew the pressures they engender for authoritative action, knew, too, how they afford a ready pretext for usurpation. We may also suspect that they suspected that emergency powers would tend to kindle emergencies."

The constitutional questions I have discussed are, in my view, not before us for decision. I mention them, as the Supreme Court said in Ex parte Endo, 1944, 323 U.S. 283, 299–300, 65 S.Ct. 208, 217, 89 L.Ed. 243, "* * * not to stir the constitutional issues which have been argued at the bar but to indicate the approach which [I] think should be made to an Act of Congress or an order of the Chief Executive that touches the sensitive area of right specifically guaranteed by the Constitution. * * * We must assume, when asked to find implied powers in a grant of legislative or executive authority, that the law makers intended to place no greater restraint on the citizen than was clearly and unmistakably indicated by the language they used."

### III.

#### *The President's Inherent Power*

The Secretary of State has always treated it as a matter within his own discretion whether he would give a travelling citizen a document surrounding him with the aura of this Government's protection and commending him to other governments. In Shachtman we noted the authorities "which have recognized a great breadth of Executive authority and discretion" in this regard.[54] But, we

---

protective custody, that is, purely for reasons of state, this could not be reviewed or stopped by any court." Id. 345 U.S. at pages 225–226, n. 8, 73 S.Ct. at page 636.

53. The Emergency Detention Act of 1950 (Title II of the Internal Security Act), to deal with "fifth column" problems, authorizes the President, in time of invasion, declared state of war or insurrection in aid of a foreign enemy, to proclaim an "Internal Security Emergency" and to apprehend and detain persons as to whom there is reasonable ground to believe that they "probably will engage in, or probably will conspire with others to engage in, acts of espionage or of sabotage." 50 U.S.C.A. §§ 812, 813, 64 Stat. 1021 (1950). The original bill, S. 4130, 81st Cong., 2d Sess. (1950), had contained provisions authorizing detention during such "cold war" emergencies as an "imminent invasion" or a congressionally declared emergency, but these provisions were eliminated because of doubtful constitutionality. Note, The Internal Security Act of 1950, 51 Col.L.Rev. 606, 651 (1951).

54. 96 U.S.App.D.C. at page 289, 225 F.2d at page 940.

pointed out: "Now it is unlawful for a citizen to travel to Europe and impossible to enter European countries without a passport."[55] The question is whether the Executive has power, by withholding a passport, to confine a citizen within the United States. The Constitution grants no such power. But the Secretary purports to find it in "the very delicate, plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations * * *." United States v. Curtiss-Wright Export Corp., 1936, 299 U.S. 304, 320, 57 S.Ct. 216, 221.

Numerous cases both before and after Curtiss-Wright support the proposition that the President has broad powers in the field of foreign relations. But there is a great gulf between the powers involved in those cases and the power the Secretary claims here. Those cases all relate in some direct fashion to the Executive's traditional power to do things which depend upon negotiations with foreign sovereignties or which bear directly upon our relations with foreign governments. What the Court upheld in Curtiss-Wright was the President's "power to negotiate with foreign governments."[56] It sustained delegation to the President of the function of declaring an embargo of munitions sales, because the function was to be exercised "after consultation with the governments of other American Republics and with their cooperation, as well as that of such other governments as [the President] may deem necessary * * *."[57] The other cases have recognized that it is for the Executive, or the Executive with Congress, free from judicial interference, to deal with such matters as recognition of foreign governments,[58] assessment of treaty obligations,[59] resolution of disputed sovereignties,[60] acquisition of new lands,[61] exclusion[62] or expulsion[63] of aliens, imposition of emergency controls over alien property,[64] establishment of an international war crimes tribunal,[65] allocation of an international air route,[66] or creation of an interna-

55. 96 U.S.App.D.C. at page 290, 225 F.2d at page 941.

56. Mr. Justice Clark concurring in Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. at page 661 n. 3, 72 S.Ct. at page 883. See the authorities collected in Z & F Assets Realization Corp. v. Hull, 1940, 72 App.D.C. 234, 114 F.2d 464.

57. 48 Stat. 811 (1934).

58. United States v. Palmer, 1818, 3 Wheat. 610, 633–634, 4 L.Ed. 471; Jones v. United States, 1890, 137 U.S. 202, 11 S.Ct. 80, 34 L.Ed. 691; Oetjen v. Central Leather Co., 1918, 246 U.S. 297, 38 S.Ct. 309, 62 L.Ed. 726; United States v. Belmont, 1937, 301 U.S. 324, 330, 57 S.Ct. 758, 81 L.Ed. 1134; United States v. Pink, 1942, 315 U.S. 203, 229, 62 S.Ct. 552, 86 L.Ed. 796; Latvian State Cargo & Passenger S.S. Co. v. McGrath, 88 U.S. App.D.C. 226, 188 F.2d 1000, certiorari denied, 1951, 342 U.S. 816, 72 S.Ct. 30, 96 L.Ed. 617.

59. Ware v. Hylton, 1796, 3 Dall. 199, 260, 1 L.Ed. 568; Doe ex dem. Clark v. Braden, 1853, 16 How. 635, 657, 14 L.Ed. 1090; Terlinden v. Ames, 1902, 184 U.S. 270, 22 S.Ct. 484, 46 L.Ed. 534; Ivance-

vic v. Artukovic, 9 Cir., 1954, 211 F.2d 565, 573.

60. Foster v. Neilson, 1829, 2 Pet. 253, 307–309, 7 L.Ed. 415; Williams v. Suffolk Ins. Co., 1839, 13 Pet. 415, 10 L.Ed. 226; In re Cooper, 1892, 143 U.S. 472, 12 S.Ct. 453, 36 L.Ed. 232; The Kodiak, D.C.Alaska 1892, 53 F. 126.

61. Wilson v. Shaw, 1907, 204 U.S. 24, 27 S.Ct. 233, 51 L.Ed. 351; Mr. Justice Frankfurter, dissenting in United States v. California, 1947, 332 U.S. 19, 45, 67 S.Ct. 1658, 91 L.Ed. 1889.

62. United States ex rel. Knauff v. Shaughnessy, 1950, 338 U.S. 537, 542, 70 S.Ct. 309, 94 L.Ed. 317.

63. Carlson v. Landon, 1952, 342 U.S. 524, 534, 72 S.Ct. 525, 96 L.Ed. 547; Harisiades v. Shaughnessy, 1952, 342 U.S. 580, 587–590, 72 S.Ct. 512, 96 L.Ed. 586.

64. United States v. Von Clemm, 2 Cir., 1943, 136 F.2d 968, 970.

65. Mr. Justice Douglas, concurring in Koki Hirota v. McArthur, 1949, 338 U.S. 197, 208, 69 S.Ct. 1238, 93 L.Ed. 1902.

66. Chicago & Southern Air Lines v. Waterman Steamship Corp., 1948, 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568.

tional "Mixed Claims Commission."[67] None of the "foreign affairs" cases, it has been observed, "involved a situation where the Executive action was specifically directed at restraining the freedom of a particular individual."[68] Chief Justice Marshall, describing those Executive powers which are beyond judicial control and citing the foreign affairs power as an example, said: "The subjects are political: they respect the nation, not individual rights, and being entrusted to the executive, the decision of the executive is conclusive."[69] Marbury v. Madison, 1803, 1 Cranch 137, 166, 2 L.Ed. 60. A characteristic of the political power which is to be exercised free of judicial interference is its "lack of satisfactory criteria for a judicial determination." Coleman v. Miller, 1939, 307 U.S. 433, 454–455, 59 S.Ct. 972, 982, 83 L.Ed. 1385.[70] By this test I think it clear that the power the Secretary asserts here is not a political power.[71]

The Secretary finds authority to abridge the right to travel in what Curtiss-Wright recognized as an inherent executive power to deal with "a situation entirely external to the United States, and falling within the category of foreign affairs * * *." 299 U.S. at page 315, 57 S.Ct. at page 218. Extending to internal affairs the President's inherent power over external affairs has dangerous implications.[72]

67. Z & F Assets Realization Corp. v. Hull, 1940, 72 App.D.C. 234, 114 F.2d 464, 466, affirmed, 1941, 311 U.S. 740, 61 S.Ct. 351, 85 L.Ed. 288.

68. Comment, 61 Yale L.J. at 187. The Chicago & Southern Air Lines case, supra note 66, is not an exception. The Court there held that the President's selection of one applicant over another for an international air route was not to be interfered with, because "both as Commander-in-Chief and as the Nation's organ for foreign affairs, [he] has available intelligence services whose reports are not and ought not to be published to the world." 333 U.S. at page 111, 68 S. Ct. at page 436. "The Court evidently was assuming that any secret information the President may have relied upon was in the nature of legislative facts and not adjudicative facts—that the information pertained to international relations and not to qualifications of the particular applicants. * * * Thus an applicant for a license is entitled to a trial type of hearing on issues of fact concerning his qualifications but not necessarily on issues of fact concerning need for the service or conditions in the territory to be served." Davis, The Requirement of a Trial-Type Hearing, 70 Harv. L.Rev. 193 at pages 264, 275 (1956).

69. That the executive power with respect to passports is not of this conclusive character was settled in Perkins v. Elg, 1939, 307 U.S. 325, 349–350, 59 S.Ct. 884, 83 L.Ed. 1320.

70. See also the Chicago & Southern Air Lines case, supra note 66, 333 U.S. at page 111, 68 S.Ct. 431.

71. "The validity of restrictions on the freedom of movement of particular individuals, both substantively and procedurally, is precisely the sort of matter that is the peculiar domain of the courts." Comment, 61 Yale L.J. at page 187. The Secretary's position that "the issuance and denial of passports is within the field of conducting foreign policy" has been described by one commentator as "[a] strange, and to this writer's knowledge, unique position among the countries with democratic and constitutional background." Doman, op. cit. supra note 17, at page 309.

72. Madison wrote to Jefferson in 1798: "The management of foreign relations appears to be the most susceptible of abuse of all the trusts committed to a Government, because they can be concealed or disclosed, or disclosed in such parts and at such times as will best suit particular views; and because the body of the people are less capable of judging and are more under the influence of prejudices, on that branch of their affairs, than of any other. Perhaps it is a universal truth that the loss of liberty at home is to be charged to provisions against danger, real or pretended, from abroad." Padover, The Complete Madison (1953) 257–58.

Mr. Justice Jackson, concurring in Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. at page 642, 72 S.Ct. at page 873, declared:

" * * * no doctrine that the Court could promulgate would seem to me more sinister and alarming than that a President whose conduct of foreign affairs is so largely uncontrolled, and often even is

Those implications have caused some authorities to shrink from the inherent power doctrine as from something "revolutionary and subversive of our constitutional system";[73] or to anticipate from it a carry-over to our national government of all the royal prerogatives which ancient common law associated with the foreign affairs powers of the King of England;[74] or to fear that it "would, at a stroke, equip the Federal Government with every power possessed by any other sovereign State."[75]

In our complex world there are very few purely internal affairs. Foreign problems cast their shadows on the domestic scene and internal events influence foreign policy. The Department of State has declared that "There is no longer any real distinction between 'domestic' and 'foreign' affairs."[76] If that is so, the inherent power doctrine could produce an extension of the executive power beyond any limits heretofore conceived; and the President, through his Secretary of State could preempt the internal security functions of Congress.

But the Supreme Court has confined the inherent foreign affairs power within accountable limits.[77] I am convinced from my review of the authorities and my study of history that the power here claimed by the Secretary is beyond those limits. Curtiss-Wright declares that an extra-constitutional foreign relations power passed to the President from the British Crown. To say that *all* the powers of the Crown devolved upon the President would, of course, be inconsistent with the basic principle that every

unknown, can vastly enlarge his mastery over the internal affairs of the country by his own commitment of the Nation's armed forces to some foreign venture."

73. Patterson, In re the United States v. The Curtiss-Wright Corporation, 22 Texas L.Rev. 286 (1944).

74. Goebel, Constitutional History and Constitutional Law, 38 Col.L.Rev. 555, 571–72 (1938). In token that his fears are not fanciful, Professor Goebel cites Den. ex dem. Murray v. Hoboken Land & Improvement Co., 1855, 18 How. 272, 276–277, 15 L.Ed. 372, where Mr. Justice Curtis, in upholding the right of the Solicitor of the Treasury Department to proceed by distraint, without judicial process, against the property of a defalcating customs collector, reasoned that the taking was not without due process of law because at common law the Exchequer could use the writ of *extendi facias* to seize the "goods of the King's debtor * * * without requiring any previous inquisition * * *."

75. 1 Willoughby, The Constitution of the United States 92 (2d ed. 1929); see also Leviton, The Foreign Relations Power: An Analysis of Mr. Justice Sutherland's Theory, 55 Yale L.J. 467, 493 (1946). See the concurring opinion of Mr. Justice Jackson in Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. at page 641, 72 S.Ct. at page 873, replying to the Government's argument that the vesting of "The Executive Power" in the President is a grant of all possible executive power: "The example of such unlimited executive power that must have most impressed the forefathers was the prerogative exercised by George III, and the description of its evils in the Declaration of Independence leads me to doubt that they were creating their new Executive in his image." One of the evils denounced in the Declaration may have been the King's attempt to prevent emigration to the colonies. Note, 41 Geo. L.J., supra note 28, at 70. Even in the earliest colonial period, Charles I, in the exercise of the royal prerogative to confine the subject to the realm, issued a proclamation against taking passage to America, because some who were going were " 'idle and refractory persons' who wished to live out of reach of authority." 10 Holdsworth, History of English Law 390 (1938).

76. Our Foreign Policy, Department of State Publication 3972, General Foreign Policy Series 26, Sept. 1950, p. 4.

77. Supra notes 58–67. In Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. at page 587, 72 S.Ct. at page 867, the Court said, dealing with the analogous question of the extent of the President's military power: "Even though 'theater of war' be an expanding concept, we cannot with faithfulness to our constitutional system hold that the Commander in Chief of the Armed Forces has the ultimate power as such to take possession of private property in order to keep labor disputes from stopping production. This is a job for the Nation's lawmakers, not for its military authorities." See also text at notes 95–97, infra.

branch of the national government has only a limited power, and Curtiss-Wright does not even suggest such a thing.[78]

The British Crown had a prerogative to confine subjects to the realm by writs *ne exeat regno*.[79] But it was not one of the prerogatives which devolved upon our President. It had its roots in the Crown's earliest constitutional controversies with the clergy [80] and the barons.[81] By the year 1382, restraints against clerics and notables were relaxed, but a prohibition was placed upon unlicensed departure from the realm by the common subjects of the King. 5 Rich. II, c. 2, §§ 6, 7. In 1607 that prohibition was repealed, 4 James I, c. 1, so that ostensibly freedom of travel was restored, except to persons covered by special statutes.[82] It is undeniable, however, that the Crown continued to exercise its prerogative to confine subjects to the realm, at least until about one hundred years before our Revolution.[83]

The manner in which British kings employed *ne exeat* was in some ways strikingly similar to our State Department's present policies and practices. The writ first used "to hinder the clergy from going to Rome * * *, was afterward extended to laymen machinating and concerting measures against the state * * *." [84] At one time the class confined to the realm included "all archers and artificers, lest they should instruct foreigners to rival us in their several trades and manufactures." [85] Bacon says the writs were issuable "in respect of attempts prejudicial to the King and State: (in which case the Lord Chancellor will grant them upon prayer of any of the principal Secretaries, without cause, or upon such information as his Lordship shall think of weight) * * *.[86]

The power to confine subjects to the realm, though it had fallen into disuse,[87]

---

**78.** A specific royal prerogative, in its devolution upon our national government, may be divided between the executive and legislative branches. See, e. g., 1863, 10 Ops. Att'y Gen. 452.

**79.** See Note, 41 Geo.L.J. at 64–70.

**80.** From the struggles of Henry II with Thomas à Becket emerged, in 1164, the fourth article of the Constitutions of Clarendon prohibiting ecclesiastics from leaving the realm without the king's permission.

**81.** John's struggle with the barons culminated, in 1215, in Magna Carta which provided in c. 42:

"It shall be lawful in future for anyone (excepting always those imprisoned or outlawed in accordance with the law of the kingdom, and natives of any country at war with us, and merchants, who shall be treated as [otherwise] provided) to leave our kingdom and to return, safe and secure by land and water, except for a short period in time of war, on grounds of public policy—reserving always the allegiance. due to us."
This provision did not survive John. It was omitted from the confirmation of the Charter in 1217 and the definitive proclamation by Henry III in 1225 which is the Charter's present statutory form. Supra note 79 at 67–68; Goebel, op. cit. supra note 74, at 573–74 n. 51.

**82.** Largely affecting children sought to be sent abroad for Catholic education. Supra note 79, at 69.

**83.** Goebel, op. cit. supra note 74, at 573–74 n. 51; 10 Holdsworth, op. cit. supra note 75, at 391–92.

**84.** 1 Blackstone, Commentaries (Wendell's ed. 1854) 266 n. 22.

**85.** Id. at 265–66.

**86.** Ordinances, No. 89, quoted in Beames, Ne Exeat Regno (1st Amer. ed., 1821) 17. In form, the writ commanded the subject "that he go not beyond the seas or out of the realm without a license" upon the stated ground that "we are given to understand that you design to go privately into foreign parts and intend to prosecute there many things prejudicial to us * * *." Provision was made whereby the subject could apply to Chancery for a license. Parker, op. cit. supra note 28, at 867.

**87.** The writ *ne exeat* has continued to be employed only as a private equitable remedy to prevent flight of creditors. Supra note 85; Parker, op. cit. supra note 28 at 867–68. In its aspect as a private equitable remedy, it was imported into our law. 1 Stat. 334 (1793) ; Judicial Code § 261, 36 Stat. 1162 (1911), 28 U.S.C. § 376 (1940) ; now covered by Rule 64, Fed.R.Civ.P.,

was still part of the king's prerogative when we became an independent nation. The draftsmen of our Constitution were familiar with it through Blackstone, "that handbook of the American revolutionary." [88]

Blackstone divided the prerogatives of the Crown into two general categories: those relating to "intercourse with foreign nations"; and those relating to "domestic government and civil polity." 1 Commentaries (Wendell's ed. 1854) 252. It is the first branch of the royal prerogative to which Curtiss-Wright refers and upon which the Secretary here relies.

"With regard to foreign concerns," says Blackstone, "the king is the delegate or representative of his people. * * * In the king, therefore, as in a center, all the rays of his people are united * * *." [89] Ibid. The king's foreign affairs prerogative included the following components: (1) "the sole power of sending embassadors to foreign states, and receiving embassadors at home," id. at 252–56; (2) making "treaties, leagues and alliances with foreign states and princes," id. at 256; (3) "making war and peace," id. at 256–57; (4) issuing "letters of marque and reprisal," id. at 257–59; and (5) granting "safe conducts" or "passports" to *aliens* coming to the realm, id. at 259–60.[90]

The foreign affairs prerogative *did not include the power to confine subjects to the realm*. This was part of the *domestic prerogative* having to do with *military affairs*. Id. at 265. Blackstone says, id. at 262:

"The king is considered * * * as the generalissimo, or the first in the military command, within the kingdom. The great end of society is to protect the weakness of individuals by the united strength of the community; and the principal use of government is to direct that

28 U.S.C., see Notes of Advisory Committee. The royal prerogative still exists in England, but whether it may be exercised in time of peace is doubtful. Note, 41 Geo.L.J. at 70.

88. Rutland, The Birth of the Bill of Rights 11 (1955). "Blackstone's Commentaries are accepted as the most satisfactory exposition of the common law of England. At the time of the Federal Constitution it had been published about twenty years, and it has been said that more copies of the work had been sold in this country than in England, so that undoubtedly the framers of the Constitution were familiar with it." Schick v. United States, 1904, 195 U.S. 65, 69, 24 S.Ct. 826, 827, 49 L.Ed. 99. Professor Crosskey refers to the Commentaries as "that great 'best-seller' of the eighteenth century" and points out that some of the members of the Constitutional Convention were on the subscription list of the original American edition in 1772. Politics and the Constitution, Vol. 1, p. 411, and Vol. 2, p. 1326, n. 3 (1953).

89. Cf. John Marshall, in an address to the House of Representatives in 1800: "The President is the sole organ of the nation in its external relations, and its sole representative with foreign nations." 10 Annals of Congress, 6th Cong., 1st Sess., col. 613 (1800).

90. The "passports" referred to in this part of the prerogative are merely "safe conducts" which were issued to visiting strangers "under the king's sign-manual," rather than by one of "his embassadors abroad." Id at 259. This part of the foreign affairs prerogative has been carried over to our Government. See United States ex rel. Knauff v. Shaughnessy, 1950, 338 U.S. 537, 542, 70 S.Ct. 309, 312, 94 L.Ed. 317: "The exclusion of aliens is a fundamental act of sovereignty * * * [which] stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation." See also Carlson v. Landon, 1952, 342 U.S. 524, 534, 72 S.Ct. 525, 96 L.Ed. 547; Harisiades v. Shaughnessy, 1952, 342 U.S. 580, 587–589, 72 S.Ct. 512, 96 L.Ed. 586; and Galvan v. Press, 1954, 347 U.S. 522, 530, 74 S.Ct. 737, 98 L.Ed. 911. The majority's reliance upon Galvan to support a power to control the movements of *citizens* is thus misplaced. See text at note 36 supra.

So far as the rest of the royal prerogative over foreign affairs is concerned, the power to make war and to issue letters of marque and reprisal were confined by our Constitution to the legislative branch, and the sending of ambassadors to and making of treaties with other nations were given to the President, but with a role preserved for the Senate.

united strength in the best and most effectual manner, to answer the end proposed. Monarchial government is allowed to be the fittest of any for this purpose; it follows, therefore, from the very end of its institution, that in a monarchy the military power must be trusted in the hands of the prince."

And, "because that every man ought of right to defend the king and his realm, therefore the king, at his pleasure, may command him by his writ that he go not beyond the seas, or out of the realm, without license * * *." Id. at 265.

Since the king's *ne exeat* power was part of his domestic military prerogative, rather than his foreign affairs prerogative, Curtiss-Wright lends no support to a theory that the power devolved upon our President.

It is plain that our Constitution, with respect to things military, conveyed to Congress most of the powers which were the king's prerogative,[91] leaving the President only the command function. The President's military power, said Hamilton, "would amount to nothing more than the supreme command and direction of the military and naval forces, a first General and admiral of the Confederacy; while that of the British king extends to the *declaring* of war and to the *raising* and *regulating* of fleets and

armies; all of which, by the Constitution under consideration, would appertain to the legislature." The Federalist, No. 69 (Ford ed. 1898), p. 460.[92] Since the American citizen does not owe the President such a duty of defense as the British subject owes his monarch, there is no basis for implying a grant to the President of the *ne exeat* power which might be necessary to enforce such a duty. We owe our duties to the nation, not to its chief executive.[93]

The notion that the President possesses inherent *military* power to deal with internal affairs involving private rights was disposed of in Youngstown Sheet & Tube Co. v. Sawyer, 1952, 343 U.S. 579, 72 S.Ct. 863. The Court ruled that it could not "with faithfulness to our constitutional system hold that the Commander in Chief of the Armed Forces has the ultimate power as such to take possession of private property in order to keep labor disputes from stopping production." Id. 343 U.S. at page 587, 72 S.Ct. at page 867. Mr. Justice Douglas concurring, declared that "our history and tradition rebel at the thought that the grant of military power carries with it authority over civilian affairs." Id. 343 U.S. at page 632, 72 S.Ct. at page 888, Mr. Justice Jackson added: "That military powers of the Commander in Chief were not to supersede representa-

---

91. E. g., "to raise and support Armies," "to provide and maintain a Navy," "to make Rules for the Government and Regulation of the land and naval Forces," the various militia powers, and the authority to legislate with respect to places "for the Erection of Forts, Magazines, Arsenals, Dock-Yards and other needful Buildings." Constitution, Art. I, § 8.

92. Professor Crosskey points out that St. George Tucker, a Jeffersonian, in his 1803 edition of Blackstone, noted that "the student c[ould] not fail to have remarked how many of the most important prerogatives of the British Crown [had been] transferred *from the executive authority*, in the United States, *to the supreme national council in Congress*." Op. cit. supra note 88 at 415. Crosskey concludes as to the military prerogative: "So, in this whole field in which the powers of the King were

so very great—the field of authority from which, if from any, the Convention may have feared a future American monarchy might conceivably arise—the 'supremacy' of Congress was most carefully and amply provided: apart from the bare 'command' in actual action and administration, all the foregoing authorities of the English King, as 'generalissimo,' were specifically transferred to Congress or subjected, in the plainest terms, to Senatorial or Congressional control." Id. at 427.

93. A cognate of the writ *ne exeat* is the writ available to the king to recall a subject to the realm from abroad. Supra note 84 at 266. To the extent that this prerogative power passed to our Government, it is lodged not in the President but in Congress. See Blackmer v. United States, 1932, 284 U.S. 421, 437–438, 52 S.Ct. 252, 76 L.Ed. 375.

tive government of internal affairs seems obvious from the Constitution and from elementary American history. * * * [The President's] command power is not such an absolute as might be implied from that office in a militaristic system but is subject to limitations consistent with a constitutional Republic whose law and policy-making branch is a representative Congress." Id. 343 at pages 644, 645–666, 72 S.Ct. at pages 874, 875–885.[94]

At the time of Youngstown our Armed Forces were engaged in active combat in Korea. The record before the Court contained a number of affidavits by high Government officials, typical of which was that of the Secretary of Defense, which stated:

" * * * any curtailment in the production of steel even for a short period of time will have serious effects on the programs of the Department of Defense which are essential to national security. A work stoppage in the steel industry will result immediately in serious curtailment of production of essential weapons and munitions of all kinds; if permitted to continue it would weaken the defense effort in all critical areas and would imperil the safety of our fighting men and that of the nation."

Chief Justice Vinson, dissenting, thought "the uncontroverted affidavits in this record amply support the [President's] finding that 'a work stoppage would immediately jeopardize and imperil our national defense.'" Id. 343 U.S. at page 679, 72 S.Ct. at page 935. He also cited our numerous international undertakings—United Nations, Korea, Truman Plan, Marshall Plan, North Atlantic Treaty Organization and Mutual Security—all of which might be imperilled if the President's seizure were not upheld. Id. 343 U.S. at pages 668–672, 72 S.Ct. 929–931. He found support for the seizure not only in the President's military power and in his foreign relations power, id. 343 U.S. at pages 679, 681, 72 S.Ct. 934, 935, but also in the fact that the emergency required emergency action. Id. 343 U.S. at pages 668, 708–710, 72 S.Ct. 948–949. The Court, however, repudiated these views. It held that the seizure of steel mills involved in labor strife was within Congress' "exclusive constitutional authority * * * in both good and bad times." Id. 343 U.S. at pages 588–589, 72 S.Ct. 867.

The military power has in the past been argued to be broad enough to subject to court-martial civilians who obstruct the successful prosecution of hostilities.[95] But as Professor Edmund M. Morgan pointed out: "Every act of treason would, by this reasoning, be punishable by court-martial, and the third section of article III of the constitution would have no field of operation."[96] When, during World War I, legislation was offered to subject all spies to court-martial, on the theory that the whole of the United States was a war zone, President Wilson said: "I think that it is not only unconstitutional, but that in character it would put us upon the level of the very people we are fighting and and affecting to despise."[97]

---

94. The executive absolutism implicit in the royal prerogative has its counterpart in modern systems of government which, though formally representative, differ from ours in basic philosophy. Thus, under the Venezuelan theory of "cesarismo democratico," the president is "democracy personified, the nation made man" and his "influence and power * * extend to all levels of government. * * *" Lott, Executive Power in Venezuela, 50 The American Political Science Review 422, 425, 440 (1956).

95. Winthrop, Military Law and Precedents (2d ed. 1920) 103.

96. Morgan, Court Martial Jurisdiction Over Non-Military Persons Under the Articles of War, 4 Minn.L.Rev. 79, 106 (1920).

97. Rankin, When the Civil Law Fails (1939) 138–39.

596

## IV.
### Conclusion

My conclusions are that (1) the President has not delegated to the Secretary of State the power to decide which Americans may travel and which may not; (2) neither of the two statutes relied on by the Secretary as a source of such power—22 U.S.C.A. § 211a and 8 U.S.C.A. § 1185—grants the power, in terms, either to the President or to the Secretary; (3) a construction of either or both of the statutes as granting the power would conflict with other expressions of congressional policy and would raise constitutional doubts of the utmost gravity, especially to the extent that eligibility is made to depend upon matters of political belief and association; (4) since the power was not conferred by statute, the President does not possess it, for it is not one of the powers inherent in his office.

The broad power to curtail the movements of citizens of the United States, to the extent that our Government possesses it, *is vested in Congress, not in the President.* Travel is being controlled today for purposes of internal security. To call it a matter of foreign relations is mere pretense. Whether our internal security requires the drastic measure of restricting travel and, if so, to what extent and by what criteria and procedures is for Congress to decide. If and when Congress acts, there will presumably be hearings, reports and debates which may serve to limit what Congress elects to do and may help to interpret what it does. The constitutionality of any such measure will, of course, depend on its provisions and the circumstances in which it is enacted.

The question before us is whether the Secretary of State has power to establish such substantive criteria for travel as are here involved. We need not decide and I do not say that there are no cir-

cumstances under which the Secretary may restrain a citizen's travel. Whether he may deny a passport to prevent a flight from justice[98] or in aid of the enforcement of some specific law, e. g., the Universal Military Training and Service Act,[99] are questions that may arise in other cases. In any event, the exercise of such powers would be a far cry from the Secretary's present undertaking.

EDGERTON, Chief Judge (dissenting).

We have temporized too long with the passport practices of the State Department. Iron curtains have no place in a free world. I think the Secretary should be directed to issue a passport.

"Undoubtedly the right of locomotion, the right to remove from one place to another according to inclination, is an attribute of personal liberty, and the right, ordinarily, of free transit from or through the territory of any State is a right secured by * * * the Constitution." Williams v. Fears, 179 U.S. 270, 274, 21 S.Ct. 128, 45 L.Ed. 186. We have held that the right to leave the country is an attribute of personal liberty and that restrictions on it "must conform with the provision of the Fifth Amendment that 'No person shall be * * * deprived of * * * liberty * * * without due process of law'." Shachtman v. Dulles, 96 U.S.App.D.C. 287, 290, 225 F.2d 938, 941.

But we need not and therefore should not[1] decide any constitutional question. As Judge Bazelon's opinion shows, the President and Congress have not undertaken to delegate to the Secretary the authority he claims. This is very clear when the statutes and executive orders on which he relies are construed narrowly. Delegations of authority must be construed narrowly when a narrow construction avoids serious constitutional

98. Cf. 18 U.S.C. § 1073.

99. Act of June 24, 1948, 62 Stat. 604, 50 U.S.C.A.Appendix, § 451 et seq.

1. Peters v. Hobby, 349 U.S. 331, 338, 75 S.Ct. 790, 99 L.Ed. 1129.

questions. United States v. Rumely, 345 U.S. 41, 73 S.Ct. 543, 97 L.Ed. 770.

The Secretary proposes to continue restricting the personal liberty of a citizen because statements by informants whom the Secretary does not identify have led him to think that if the citizen goes abroad he will do something, the nature of which the Secretary does not suggest, which the Secretary thinks, for reasons known only to him, will be contrary to what, for reasons known only to him, he conceives to be "the national interest". If Congress or the President had undertaken to authorize this, serious constitutional questions would arise. May the government deprive a citizen of his constitutional liberty to go abroad (1) without a jury trial, (2) without a definite standard of guilt, (3) without sworn testimony, and (4) without an opportunity to confront his accusers or know their identity? May it deprive him of this liberty because of the way he has exercised his First Amendment rights of free speech, press, and assembly? Since neither Congress nor the President has undertaken to give the Secretary the authority he claims, we need not consider these constitutional questions.

FAHY, Circuit Judge (dissenting).

The discretion of the Secretary in issuing passports prior to the enactment in 1941 of 66 Stat. 190, 8 U.S.C. § 1185 (b) (1952), 8 U.S.C.A. § 1185(b), see Shachtman v. Dulles, 96 U.S.App.D.C. 287, 225 F.2d 938, was subject to no clear limitation except that the applicant must qualify as one who owed allegiance to the United States.[1] A passport was in the nature of a political document; one need not have it in order to obtain passage and depart from the United States. So no deprivation of liberty and no justiciable controversy were involved in denial of a passport. But 8 U.S.C. § 1185(b), 8 U.S.C.A. § 1185(b), changed all this. By that statute Congress provided that when the United States is at war or during the existence of any national emergency proclaimed by the President no citizen may lawfully depart from the United States without a valid passport, with exceptions not here pertinent. This was an assertion by Congress of restraint upon travel based upon the war power, coupled with the executive control over passports incident to the conduct of foreign affairs noted in Shachtman. The new statute, however, did not enumerate other specific criteria, notwithstanding a passport thenceforth was not merely a political document the denial of which entailed no deprivation of liberty. But I do not think the absence from 8 U.S.C. § 1185(b), 8 U.S.C.A. § 1185(b), of more specific criteria renders nugatory the control in question.[2] The statute explicitly limits the control to a time of war or of a presidentially proclaimed national emergency, and to passports. Control related to the war powers and to the conduct of foreign affairs is thus plainly intended. In order to be validly exercised the powers thus invoked, though subject to the Constitution, are not held to the same degree of legislative or other specificity as are those of government generally. Moreover, we do not have here, as in Youngstown Sheet and Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, an attempted exercise of executive authority alone; the problem is more like that involved in Hirabayashi v. United States, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774, where there was a combination of legislative and executive authority. Here Congress seeks to control travel and to that end to enlarge the significance of executive control over passports, in time of war

---

[1] 32 Stat. 386 (1902), 22 U.S.C. § 212 (1952), 22 U.S.C.A. § 212, which amended 14 Stat. 54 (1866). Under the earlier law only citizens were eligible for passports.

[2] It seems manifest that control was attempted. No longer was there to be merely the ascertainment of the obligation or not of allegiance. Before 8 U.S. C. § 1185(b), 8 U.S.C.A. § 1185(b), was enacted this qualification was the sole essential. The enactment, therefore, was a definite authorization by Congress of control of the travel of some who had that qualification.

or national emergency. When the Act of Congress is considered with the authority of the executive I think the courts would not be justified in entirely nullifying all control other than that incident to ascertainment by the issuing authority of whether or not the applicant owes allegiance to the United States. I am reassured in this view by the fact that the passport to be issued need be only a simple pass or permit which enables the possessor to depart lawfully from the United States, and no more; and, furthermore, the control is always limited by the requirements of the Due Process Clause. Shachtman v. Dulles, supra; Bauer v. Acheson, D.C., 106 F. Supp. 445. Upon these considerations I would interpret the control enacted by Congress as valid when exercised consistently with due process to prevent the reasonable likelihood of harm to our national defense or to the conduct of our foreign affairs. This gives valid content to the Act of Congress, a result to be preferred, when reasonably possible, to a holding that Congress has entirely failed in its intended purpose. Cf. United States v. Rumely, 345 U.S. 41, 73 S.Ct. 543, 97 L.Ed. 770, and Ullman v. United States, 350 U.S. 442, 76 S.Ct. 497, 100 L.Ed. 511.

We come then to the question whether, taking the above approach, the denial of appellant's application is consistent with due process and satisfies the criteria referred to. In reaching this question I construe the factual situation as amounting to an actual denial of appellant's application on the ground that he refused to file a statement in accordance with section 51.142 of the Passport Regulations, 22 C.F.R. § 51.142 (Supp.1957). The denial flows from the regulation and not from an independent conclusion of the Secretary with respect either to appellant or to any particular geographical area. The information sought by the regulation is relevant to the criteria by which the Secretary must be guided; for travel abroad at this time by persons who owe allegiance to the United States but who are or have been members of the Communist Party may reasonably be deemed to be related to the national defense and to the conduct of foreign affairs. It does not follow, however, that refusal by the applicant to furnish this relevant information, without more, brings denial of his application into conformity with due process. It must be borne in mind that the denial deprives him of liberty to depart from the United States, a right which he has unless lawfully deprived thereof. In Garner v. Los Angeles Board, 341 U.S. 716, 71 S.Ct. 909, 95 L.Ed. 1317, the relevant information which the Court held the applicant must supply was required by law, and was with respect to retaining State employment. These two factual differences are enough I think to distinguish that case from this one. Not only has Congress not specified here that the information refused must be furnished as a condition to obtaining a passport, but the liberty to travel is on a different footing from a desire to retain State employment. In the one case there is the taking away of an existing liberty; in the other there is State control over the qualifications of its employees. And the degree of restraint involved, as well as the nature of the liberty restrained, are pertinent in determining the sufficiency of the reason assigned for the restraint. Furthermore, the failure of appellant to furnish the information may have been in good faith reliance upon the First Amendment, cf. Konigsberg v. State Bar of California, 353 U.S. 252, 77 S.Ct. 722, 1 L.Ed.2d 810, or for other good faith reasons, such as fear of prosecution for making a false statement. Of course the reason may have been that to answer truthfully would have disclosed Communist Party membership and thereby automatically have caused the application to be denied under section 51.135(a) of the Regulations. But we are not required to assume this reason, or now to decide the validity of denial of a passport based on such assumption. It is true, as pointed out in Judge Washington's concurring opinion, that Congress has declared that travel of Communist

members facilitates communication and is a prerequisite for carrying on of activities to further the purposes of the Communist movement. The Secretary cannot be required to assume that a real Communist Party Member who is a citizen of or otherwise owes allegiance to the United States, can be relied upon to adhere to his obligation of citizenship when it conflicts with the responsibility he has assumed by Party membership. For this reason a general uncertainty as to the conduct of those involved in Communist membership or discipline has a justifiable place in considering passports. But such general uncertainty is not a substitute for a decision by the issuing authority where, in any event, Party membership or discipline is not shown. An applicant who refuses to file the statement required by section 51.142 may have no derogatory information to supply, or he may need to depart for personal or other reasons unrelated to some possible Communist involvement. Yet the Secretary, though satisfied to either effect, could not permit the departure. Thus to create a general restriction on travel by those who refuse the information, without more, is not reasonable. It prohibits travel by an individual whose own reason to depart does not come within the criteria upon the basis of which the Secretary may validly refuse him permission to depart. The intended travel might be wholly unrelated to any problem of national defense or foreign affairs. To avoid this difficulty a conclusion should be reached by the issuing authority in the individual case, or with respect to the territorial area involved, on the question whether the travel would be reasonably likely to be detrimental to the national defense or to the conduct of our foreign affairs. While the issuing authority may take into consideration the refusal of the applicant to comply with section 51.142, due process is not afforded in peacetime by applying to an individual case the general restriction referred to when there is opportunity for a particular judgment. The exigencies of the situation do not require a blanket rule which, for administrative convenience or otherwise, obviates the necessity of a judgment reached by the issuing authority in the individual case. We are not at war. There is a presidentially proclaimed period of national emergency, but we must not construe the authority to be exercised as equal to that available in wartime. To bring the regulation of travel within the requirements of substantive due process, Shachtman v. Dulles, supra, calls I think for the exercise by the issuing authority of its own decisional processes to a greater degree than inheres in denial of a passport through the self-executing effect of an applicant's refusal to supply the information sought by section 51.142 of the Regulations.

Being of the views thus expressed I would reverse and remand, with direction that the case be returned by the District Court to the Secretary for reconsideration consistently with these views and with procedures required by our decision in Boudin v. Dulles, 98 U.S. App.D.C. 305, 235 F.2d 532.